UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. PELLUMB AMETI, <br><br> Realtor, <br><br> v. <br><br> SIKORSKY AIRCRAFT CORPORATION And UNITED TECHNOLOGIES CORPORATION INC. <br><br> Defendants | CIVIL ACTION NO.: <br><br><br> FILED IN CAMERA AND UNDER SEAL, PURSUANT TO §3730(b)(2) <br><br><br> JURY TRIAL DEMANDED <br><br> AUGUST 12, 2014 |

## COMPLAINT

### Preliminary Statement

1. Pellumb Ameti (the "Realtor") brings this action on behalf of the Unites States of America against Defendants Sikorsky Aircraft Corporation (hereinafter "Sikorsky") and United Technologies Corporation, Inc. (hereinafter "United Technologies") for remedies under the False Claims Act 31 U.S.C. § 3729, *et seq*. ("FCA") and Connecticut state law.

2. As required by the FCA, 31 U.S.C. § 3730(b)(2) the Realtor has provided the Attorney General of the United States and to the United States Attorney for the District of Connecticut a statement of all material evidence and information related to the Complaint. This disclosure is supported by substantially all material evidence known to Realtor at his filing establishing the existence of the Defendants' false claims. Because the statement includes attorney-client communications and work product of Realtor's attorneys, and is submitted to the Attorney General and to the United States Attorney in

their capacity as potential co-counsel in the litigation, the Realtor understands this disclosure to be confidential.

## Jurisdiction and Venue

3. The jurisdiction of this court is founded upon 28 U.S.C. §1331 (federal question), the provisions of 31 U.S.C. §§ 3732(a) and 3730(b), and pursuant to 28 U.S.C. § 1345.

4. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §1391(b) in that the claims arose in this district and Realtor resides in this district.

5. Supplemental jurisdiction over Realtor's supplemental state law claims are invoked pursuant to 28 U.S.C. §1367 as the claims arise out of the same transaction and occurrences as Realtor's federal claims.

6. Costs, expert witness fees and attorney's fees are sought pursuant to 42 U.S.C. §1988.

## PARTIES

7. Realtor, Pellumb Ameti, is a citizen of the United States and a resident of the State of Connecticut, residing at 8 Mountainview Court, Oxford, Connecticut 06478.

8. Defendant, Sikorsky Aircraft Corporation, is a corporation organized and existing under the laws of Delaware, maintains a principal place of business in Connecticut, and is engaged in business in Connecticut, within this judicial district.

9. Defendant, United Technologies Corporation, is a corporation organized and existing under the laws of Delaware, maintains a principal place of business in Connecticut, and is engaged in business in Connecticut, within this judicial district; it is the parent company of its wholly-owned subsidiary, Defendant Sikorsky.

## FACTS

10. Sikorsky designs and builds some of the world's most advanced helicopters for military use and is a leading defense contractor.

11. Sikorsky helicopters are relied upon by all five branches of the United States armed forces, along with military services and commercial operators in 40 nations.

12. Realtor was hired in 2008 as a Staff Engineer at Sikorsky in Stratford, within the Blades Product Center and specifically working for the Blades Engineering Department.

13. Realtor was terminated from Sikorsky's employment on February 28, 2014.

14. There is an employee handbook that governs the Defendants' actions.

15. Throughout his employment, Realtor received extremely positive performance reviews.

16. Throughout Realtor's employment he received a below average or no raise at all, despite his performance reviews.

17. As Staff Engineer, one of Realtor's responsibilities was to design 3-D models of helicopter blades.

18. In, 2008, Len Meyer (hereinafter "Meyer"), Design Group Lead, for all blades in production was Realtor's immediate Supervisor.

19. Kevin Viola (hereinafter "Viola"), Blades Engineering Manager, was responsible for the entire blade engineering group.

20. Frank Caputo (hereinafter "Caputo"), 53K Group Lead, was the group lead for a different model helicopter, but still within the Blades Engineering Department.

21. In November of 2008, Realtor was transferred to Caputo's 53K group to assist with the engineering of blades within the 53K group.

22. Realtor was told by Viola, the Blades Engineering Manager, that he was only to assist Caputo's group for approximately three to six months because Caputo's group was behind schedule in the design of the 53K main blade composite spar.

23. The spar is the most critical part of the main rotor blade because it is the structural component of the blade, made of Titanium or Composites; it is almost the length of the entire blade.

24. In 2010 the spar work in Caputo's group was completed and thus, Realtor was no longer needed to assist with Caputo's group.

25. Instead of Realtor returning to his original group under Meyer, he was assigned to other blade details and assisted other designers who were behind schedule in the blade design for the 53K program.

26. In or about, March, 2012, Richard Lay (hereinafter "Lay") took over Caputo's position as the 53K Group Lead.

27. Caputo simultaneously took over Viola's position and was now responsible for supervision of the entire blade's engineering group.

28. Once Caputo took over as the overall manager of the blade engineering group, Realtor requested to be moved into another organization within Sikorsky because of Caputo's litany of unfair and harassing behavior towards him in the past.

29. Lay agreed to move Realtor into the manufacturing engineering group of Corey Jones (hereinafter "Jones"), Manufacturing Engineering Group Lead, still within the blades organization, but not as a design engineer, as a manufacturing engineer.

30. In Jones' group, Realtor's immediate supervisor was now Kneil Northrop (hereinafter "Northrop"), Integrated Product Team ("IPT") Lead for units 1615, 1637 and 1635.

31. Realtor worked a partial year for Jones and was again rated as an expert (grade 4) on his performance review for his design skills.

**Reporting Issue with Defective Root End Fairing Parts**

32. In the summer of 2013, hourly employees from Northrop's group, Unit 1615, complained in writing that the root end fairings they were using had incorrect trim lines and multiple defects.

33. Root end fairings are composite three ply epoxy fiberglass details which are secondary bonded on root end, leading edge of blades, to protect the electrical connections feeding the blade de-icing heaters in the sheath assembly.

34. If the root end fairings fail to protect the blades from the water intrusion the de-icing system would fail also and won't protect the blade from ice buildup - this can cause the blade to freeze and the helicopter to crash.

35. During this time frame, Sikorsky was the Contractor and GKN Aerospace, Inc. ("GKN") was and still is one of its major subcontractors.

36. Sikorsky, as contractor, supplies tooling and designs to GKN, its subcontractor, so that GKN can produce the root end fairings.

37. The root end fairings were being supplied to Sikorsky by GKN with defects.

38. While working as a Manufacturing Engineer in Unit 1615, within Jones' group, Realtor investigated and found that the root end fairing, which were produced by GKN were defective: (i) because they did not meet the drawing requirements; (ii) their laminate quality was poor; and (iii) there were multiple defects and an incorrect trim line.

39. Realtor informed Rick Hammond (hereinafter "Hammond"), Supplier Quality Engineer, for the Blade Product Center of the defects and incorrect trim line.

40. Hammond agreed and isolated the poor quality parts from GKN and Hammond and Realtor requested that the employees only use root end fairings from the other supplier who was providing non-defective parts, instead of GKN.

41. Realtor then informed the supplier, GKN, about the quality issues with the fairings and GKN agreed the fairings it supplied Sikorsky were substandard, but stated that the fairing were defective because the tooling that Sikorsky supplied to them to manufacture the fairings were too old and substandard.

42. GKN told Realtor that Sikorsky should stop purchasing the defective parts and purchase the fairings from another supplier.

43. Realtor informed his Manager, Jones, and Rodriguez, General Manager of Operations about the fairing defects, as well as the Purchasing Manager, Steve Kiosse (hereinafter "Kiosse").

44. Realtor also informed Maria Spencer (hereinafter "Spencer"), another Purchasing Manager, responsible for reporting to Kiosse and inquired why Sikorsky was using defective parts from GKN.

45. Spencer replied that Sikorsky has a multi-year contract with GKN and its parts cost less than other suppliers; Spencer explained to Realtor that the price differential was approximately $50 per part.

46. GKN, in response to Realtor's investigation, sent a Suppliers Corrective Action Request ("SCAR"), to Sikorsky requesting approximately $4,000.00 to improve the tooling that it used in making the fairing parts so that the fairings would not be defective. GKN did not receive the funds from Sikorsky to improve the tooling.

47. In addition to poor tooling being supplied by Sikorsky causing the parts to be defective, the engineering drawings sent by Sikorsky to GKN were not up to date.

48. Tim Conti (hereinafter "Conti"), a new design engineer was assigned to correct drawing errors and release them to the manufacturing floor.

49. Conti was in Meyer's group as a design engineer.

50. Co-workers on the floor told Realtor that Caputo knew Conti's father and that was the reason that Caputo had Conti transferred into the blades group.

51. In response to the drawings not being up to date, Realtor filed a "turn-back" against Conti's group.

52. A turn-back is a written description of a procedure failure; a failure that is not allowing someone to do his/her job on time; a turn-back is logged into a special Sikorsky internal website.

53. Specifically, his turn-back alleged that Conti was not completing the design as required and not releasing it to the floor on time for the tooling to be redesigned so that the parts would not be defective.

54. After he filed the turn-back, in retaliation, Conti spoke to Realtor and implied that by filing a turn-back against his group, Plaintiff put his job in danger.

55. Specifically, Conti explained to Realtor that other engineers who filed turn-backs against Conti's group were no longer with Sikorsky; this was a legitimate threat to Realtor, given the close relationship between Conti and Caputo.

56. Jones, while knowing of the defects about the fairings and Realtor's complaints about the defects, e-mailed Realtor and directed him to release the defective parts from GKN that

Realtor and Hammond had set aside as defective, so that the parts can be used in Sikorsky's production.

57. Despite Sikorsky knowing of the defective fairing parts and GKN's request for more efficient tooling to remedy the defects, which were never supplied, Sikorsky still used the defective fairings from GKN, a less expensive supplier.

58. Sikorsky also mandated that the defective GKN parts that were isolated as poor quality and defective be released to the floor for use in the production of blade manufacturing in order to keep ongoing production of the blades disregarding, the fact that helicopters have hundreds of moving parts and when any one part fails, it can have a domino effect, causing a catastrophic result.

59. Sikorsky was using GKN defective parts and certifying that the blades met drawing requirements while knowing that these parts were not meeting drawing requirements and as such were defective.

60. Technicians on the floor wrote a turn-back based upon the defective fairings.

61. Mike Farkas (hereinafter "Farkas") (ACE pilot for unit 1615) was in charge of following turn-backs and ensuring that someone was assigned to investigate and ensure that the defective fairing were eliminated.

62. After the fairing was issued to the floor and bonded on the blade an in-process inspection was performed to inspect the fairing bond quality but not the quality of the fairing itself.

63. Sikorsky falsely certified that the blades met drawing requirements and passed all quality assurance inspections, both in-process and final inspection.

64. Upon information and belief, Sikorsky is still using the defective fairings on its blades.

65. The blades with the defective fairings were being manufactured onto the helicopters, which would subsequently be sold to the United States Government.

**Reporting Issue with Core Crushes**

66. In mid-2013, Realtor, as well as other members of his group, also noticed an issue separate from the defective fairings, to wit: they noticed that many of the blades were being damaged by Sikorsky in the manufacturing process and during transportation between different manufacturing units, i.e., core crushes.

67. When the helicopter blades are put together by Sikorsky, the main parts of the blade are bonded together; the secondary parts are then added onto the bonded blade subassembly.

68. The core crush occurs from older tooling, not designed properly to protect the blades from impact damage, crush into the blade when the secondary parts are being added to the blade during the manufacturing process or during the transportation of the blades between different manufacturing units.

69. A Sikorsky inspector inspects the blade for the defects, and if defects are found, prepares a discrepancy report ("DR") describing the defects.

70. The DR is logged into a Sikorsky computer system and the manufacturing engineer based on the description from the DR creates a process plan with repair instructions for the technicians on the floor who are going to perform the repair.

71. The process plan repair instructions are taken from standard repair procedures documented into the Bond Control Drawing.

72. As a result of noticing the defects, Realtor put another turn-back into the Sikorsky's system describing the issue with the core crushes.

73. Realtor put the turn-back in to inform and alert Frank Caputo and other engineering managers about the core crushes on the floor, resulting in the blades being damaged.

74. Realtor noticed that the lead men on the repairs were not following the process plans released on the floor in order to properly repair the damaged blades, but were instead cutting corners to reduce time and lower the cost of repairs by using scrap skin, and then bonding the patch made from a scrap skin over the crushed core and then painting the blade, concealing the crushed core, thus affecting the structural integrity of the blade.

75. Sikorsky falsely certified that the blades met drawing requirements and passed all inspection, in-process, and final inspection.

76. Sikorsky in-process inspection approved the repair on the blade even though the repair was not done per the repair procedure issued on the floor by the manufacturing engineer.

77. Repair procedure required a specific patch to be fabricated per the Bond Control Drawing.

78. If the repair was done correctly it would have taken almost two days to fabricate the patch and bond it on the blade; Sikorsky, failed to follow the approved Bond Control Procedures, and cosmetically bonded over the crushed core, contrary to the approved methods at a lower cost and less time.

79. Numerous blades were improperly repaired and provided to Sikorsky customers, i.e. the United States military as fully meeting specifications.

80. Upon information and belief, in 2013, approximately 70 blades were improperly repaired and an average of approximately 20 blades per/month for the first two months of 2014.

81. Sikorsky was then billing for the total job while using scrap skin as a patch and not following the bond control drawings.

82. Realtor discussed this problem with Northrop, IPT Lead, and Michael Santelli, lead technician in units 1615 and 1637, where Realtor worked as a Manufacturing Engineer.

83. Santelli was responsible for performing the repairs.

84. Northrop spoke to Santelli about the problem in front of Realtor and Santelli warned Northrop and exclaimed, "Don't go there!"

85. Realtor then raised his concern with Jones about the crushed cores and subsequently conducted an internal investigation and tracked the core crushes for a month to determine the cause.

86. Realtor's investigation revealed that incidents of core crushes have increased since the defect was first noticed.

87. At the conclusion of the study, Realtor found that all the core crushes could be traced to a specific tool that Sikorsky was using in the blade fabrication process and transportation dollies.

88. Realtor documented his study results and wrote up a Report, which he sent to his Manager Jones, the Mechanical Engineering Group Lead.

89. Realtor also sent the report to Seb Dimario, Manager of the Bridgeport blade engineering group, as well as the General Manager of Production, Roberto Rodrigues.

90. The Report documented all the core crushes from mid-January through mid-February 2014 showing the cause of the defects, were directly linked (1) to a specific tool on the Sikorsky manufacturing floor or (2) transportation dollies used by Sikorsky.

91. Realtor then took another step to cure the problem by contacting four (4) outside tooling experts from other Sikorsky suppliers to investigate the tooling and provide a solution to the problem.

92. The experts provided advice and a price quote to Sikorsky suggesting different methods that could be used to eliminate the defects caused by the tooling. The experts' solution was to invest in more suitable tooling, i.e., tools with better impact resistant material and lower rubber hardness which would have protected the blade during the manufacturing process from being crushed. Sikorsky at the time was using older tools not properly designed to protect the blade from impact.

93. Realtor then conducted a cost-benefit analysis which indicated that it was more profitable for Sikorsky to invest in tooling with better impact resistant material with lower rubber hardness which would have eliminated and/or reduced the core crushes, which would increase Sikorsky's profits in the future.

94. Realtor submitted the cost-benefit analysis to Jones who told him that his group didn't have the financial support for new tools and Jones told Realtor to log it into Sikorsky's Cost Management System as a cost cutting initiative, which he did.

95. A Cost Cutting Initiative is a write up which describes how to reduce/eliminate the number of defects by improving the tools or identifying and eliminating any waste in the manufacturing process in order to reduce the manufacturing cost of the product and increase the profits for the company.

96. Realtor, as recited in paragraph 93, also noticed that Sikorsky was using the wrong tooling design for the transportation dollies.

97. Realtor warned Russell, manager in charge of the employees who were preparing and transporting blades from the blades manufacturing floor using the transportation dollies; Sikorsky's transportation dollies are designed to carry three wide cord blades, not four.

98. If the transportation crew placed four blades on the transportation dollies, the blades would be damaged.

99. Mr. Russell agreed with Realtor that placing four blades on the transportation blades was damaging the blades and told Realtor he would inform his transportation crew to stop putting four blades on the dollies in order to rectify the problem but the problem was never rectified as the transportation crew continued to put four blades onto the transportation dollies.

100. Realtor called the supplier who fabricated the transportation dollies and confirmed that no more than three wide cord blades should be placed on the dolly.

101. The supplier informed Realtor that there were two different designs of transportation dollies being used and the older design, used by Sikorsky, should not have been used.

102. The supplier provided Realtor a low price quote to change the design and fabricate new inserts on the tools to accommodate four wide cord blades. Sikorsky never changed the design to accommodate the wide cord blades, while knowing that the current method of transportation was damaging blades.

103. On February 27, 2014, Realtor was escorted to Human Resources by Jones, where he was then unexpectedly terminated from employment by Caputo, despite his good performance and efforts to cure safety defects.

104. Realtor was one of the most qualified engineers in his group. Some of the employees working as engineers did not have even engineering degrees although they worked on flight safety parts.

105. Sikorsky wrongfully terminated Realtor for reporting defects in its products that are out of specification and potentially life threatening.

106. Sikorsky wrongfully terminated Realtor for attempting to report and correct substandard parts and assemblies that it refused to correct and concealed, which are potentially life threatening.

107. Sikorsky is obligated to provide safe, reliable, and quality tested products which perform to their specifications to the Government.

108. By delivering and receiving payment for helicopters with defective parts, Sikorsky is impliedly certifying compliance with the terms of its contract with the Government for the products and implying that the product met Government standards and were safe and reliable.

109. Realtor attempted to prevent Sikorsky from continuing to submit false claims to the government by reporting its fraudulent misconduct to his superiors but Sikorsky took no steps to stop or remedy the fraud.

110. When Realtor raised concerns about and tried to stop Defendant's fraud, Sikorsky unlawfully retaliated against him.

111. Sikorsky has wrongfully terminated Realtor for reporting substandard parts and assemblies that Sikorsky refused to correct in order to maximize its monetary benefit, despite knowing of the defective parts and assemblies.

112. Prior to Realtor being terminated, Realtor had not been disciplined or written up and had good performance reviews.

113. United Technologies, at all times relevant, knew or should have known of the actions and/or inaction of its subsidiary, Sikorsky, related to Realtor's complaints and reports about the defective fairings and core crushes.

<u>COUNT I</u>
**DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B)
(Against All Defendants)**

114. Realtor realleges and incorporates by reference the allegations made in Paragraphs 1-113 as if fully set forth herein.

115. Through their deliberate suppression of the results of Realtor's investigations and reporting about issues with defective fairings and core crushes, the Defendants and their agents, employees, and co-conspirators knowingly, in deliberate ignorance of falsity, or reckless disregard of falsity, presented and caused to be presented to the government, false and fraudulent claims, records, and statements in order to obtain payment for helicopters that Defendants knew were manufactured with blades that contained defective fairings and/or had defective blades caused by core crushes during Sikorsky's manufacturing process.

116. Through their deliberate suppression of the results of Realtor's investigations and reporting on the issue about defective fairings and core crushes, Defendants knowingly, in deliberate ignorance of falsity, or reckless disregard of falsity made, used, and caused to be used false statements to conceal, avoid, and/or decrease its obligation to repay money to the government that it improperly and/or frequently received by providing a product with known defects.

117. Defendants also failed to disclose to the government material facts that would have resulted in substantial repayments by the Defendants to the government.

118. Defendants submitted false claims for payment for defective parts it knew did not meet contract and/or safety requirements.

119. By virtue of the above-described acts, among others, the Defendants knowingly, in deliberate ignorance of falsity, or reckless disregard of falsity caused to be presented false or fraudulent claims for payment or approval, and continues to cause to be presented, false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

120. By virtue of the above-described acts, among others, Defendants, by and through their officers, agents, supervisors, and employees, knowingly, in deliberate ignorance of falsity, or reckless disregard of falsity, presented and caused to be presented false records or statements material to false or fraudulent claims and knowingly, in deliberate ignorance of falsity, or reckless disregard of falsity, failed to disclose material facts, in order to obtain payment or approval from the United States government on the contract, in violation of 31 U.S.C. § 3729(a)(1)(B). These false or fraudulent claims, records, and statements were material to the decision about whether to pay in full.

121. The United States suffered damages, unaware of the falsity of the records, statements, and claims made or submitted by the Defendants – or their failure to disclose material facts that would have reduced government obligations – have not recovered funds that would have been recovered otherwise if the truth were known.

122. By reason of the Defendants' false records, statements, claims, and omissions, the United States has been damaged by paying full price for helicopters with defective parts.

## COUNT II
## CONSPIRACY TO SUBMIT FALSE CLAIMS
## 31 U.S.C.§ 3729(a)(1)(C)
## (Against All Defendants)

123.  Realtor realleges and incorporates by reference the allegations made in Paragraphs 1-113 and 114-122 as if fully set forth herein.

124.  Through the above prescribed acts and omissions described in Count One, Defendants conspired to defraud the federal government by having false or fraudulent statements, records, certifications, and claims submitted to and approved, concealing defects in the design of fairings and the defects in the blades caused by the core crushes in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (B).

## COUNT III
## RETALIATION IN VIOLATION OF   31 U.S.C. § 3730(h)
## (Against Sikorsky)

125.  Realtor realleges and incorporates by reference the allegations made in Paragraphs 1-113, 114-122, and 123-124 as if fully set forth herein.

126.  Relator was an "employee" and Sikorsky was an "employer" as the terms are defined by the False Claims Act.

127.  Sikorsky discriminated against Relator and ultimately discharged him as a result of his performing lawful acts to stop one or more violations of the False Claims Act, including investigating, reporting and refusing to participate in the Defendants' breach of contract,

concealment of defects, and submission of false and fraudulent information and certifications.

128. At all relevant times, Relator was engaging in activity protected by the False Claims Act.

129. Sikorsky, knowing that Relator was engaging in such activity, discriminated against him because of his protected activity.

130. Sikorsky can offer no legitimate justification for discriminating against and ultimately discharging Relator.

131. To redress the harms he suffered as a result of the acts and conduct of Sikorsky in violation of 31 U.S.C. § 3730(h), Relator is entitled to damages including two times the amount of back pay, interest on back pay, and compensation for any special damages, including emotional distress, and any other damages available by law including litigation costs and reasonable attorneys' fees.

## COUNT IV
## VIOLATION OF CONN. GEN. STAT. § 31-51q
### (Against All Defendants)

132. Realtor realleges and incorporates by reference the allegations made in Paragraphs 1-113, 114-122, 123-124, and 125-131 as if fully set forth herein.

133. Realtor was exercising his free speech on matters of public concern by reports, complaints, concerns and investigations concerning the defective fairing and the core crushes, protected by the First Amendment of the United States Constitution and Sections, 3, 4, and 14 of the Connecticut Constitution.

134. The exercise of these rights did not materially interfere with his job performance, nor did it interfere with his job performance or working relationship with Sikorsky.

135. Plaintiff was subject to numerous forms of retaliation, including, but not limited to:

    (a) Setting him up for failure by suddenly issuing a poor performance review after several positive reviews;

    (b) Paying him less than average raises, with better than average performance reviews;

    (c) Paying him no raise, with good performance reviews; and

    (d) Termination.

112. The acts of retaliation was the direct result of Realtor's speech on a matter of public concern related to the safety of the blades that Sikorsky was assembling onto helicopters, certifying, and selling to the United Stated Government.

113. As a result of the foregoing conduct, Realtor has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

114. Realtor seeks compensatory and punitive damages for Defendants' misconduct.

**PRAYER FOR RELIEF**

**WHEREFORE**, Relator Pellumb Ameti, acting on behalf of and in the name of the United States of America, and on his own behalf, demands and prays that judgment be entered as follows against the Defendants for violations of the FCA:

    (a) In favor of the United States against the Defendants for treble damages (consisting of three times the amount of damages from the submission of false claims and concealment of defects), plus maximum civil penalties for each violation of the FCA;

    (b) In favor of the Relator for the maximum damages allowed pursuant to 31 U.S.C.

§ 3730(d) to include reasonable expenses, attorneys' fees, and costs incurred by Relator;

(c) In favor of the Relator for all compensatory and punitive damages, including personal injury damages for pain and suffering and loss of reputation, back pay, and interest, and attorneys' fees and costs to which he is entitled pursuant to 31 U.S.C § 3730(h);

(d) For all costs of the FCA civil action; and

(e) In favor of the Relator and the United States for further relief as this Court deems to be just and equitable.

THE REALTOR,
PELLUMB AMETI

By: _____
Eugene N. Axelrod, Esq.
Michael C. McMinn, Esq.
Axelrod & Associates, LLC
*His Attorneys*
8 Lunar Drive
Woodbridge, CT 06525
Tel: 203-389-6526
Fax: 203-389-2656
