UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PELLUMB AMETI, ex rel. | : | |
| UNITED STATES, | : | |
| *Plaintiff*, | : | CIVIL CASE NUMBER: |
| | : | |
| v. | : | 3:14-cv-1223 (VLB) |
| | : | |
| SIKORSKY AIRCRAFT CORP., | : | June 19, 2017 |
| UNITED TECHNOLOGIES CORP., | : | |
| *Defendants*. | : | |

## MEMORANDUM OF DECISION ON MOTION TO DISMISS AMENDED FALSE CLAIMS ACT COMPLAINT [DKT. 53]

Before the Court is Defendant Sikorsky Aircraft Corporation's ("Sikorsky") Motion to Dismiss the Amended False Claims Act ("FCA") Complaint. Discovery has been stayed pending the outcome of this motion. Plaintiff Pellumb Ameti ("Ameti" or "Plaintiff") was fired by his employer, Sikorsky Aircraft Corporation ("Sikorsky") in February 2014. Upon his termination, he filed two cases that have since been consolidated: (1) an FCA action and its related retaliation claims; and (2) an employment discrimination and unfair practices action. Defendant seeks to dismiss only the FCA action, which alleges violations of the FCA, 31 U.S.C. § 3729(a)(1)(A)-(C); retaliation in violation of 31 U.S.C. § 3730(h); and retaliation for exercising free speech in violation of Conn. Gen. Stat. § 31-51q. For the following reasons, the Court DISMISSES these claims.

## BACKGROUND

### I. Procedural Posture

Ameti filed this FCA action and its related claims on August 22, 2014. *See* [Dkt. 1 (Compl.)]. On March 28, 2016, the United States notified the Court of its

decision not to intervene in this action. *See* [Dkt. 14 (Notice of Declination to Intervene)]. On June 20, 2016, the Court consolidated this action with *Ameti v. Sikorsky Aircraft Corp.*, case no. 15-cv-235 (VLB) (D. Conn.), which raises allegations of employment discrimination and unfair employment practices.[1]

A month later, Sikorsky filed a Motion to Dismiss as well as a Motion to Stay Discovery pending resolution of the Motion to Dismiss. *See* [Dkts. 39 (Mot. Dismiss), 40 (Mot. Stay)]. On September 15, 2016, Plaintiff filed an Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(2), which eliminated any reference to Defendant United Technologies Corporation ("UTC"). *See* [Dkt. 51 (Am. Compl.)].[2] Defendant Sikorsky Aircraft Corporation ("Sikorsky") then filed the instant Motion to Dismiss on September 29, 2016. *See* [Dkt. 53-1 (Am. Mot. Dismiss)]. The Court referred the pending Motion to Stay to Magistrate Judge Robert A. Richardson, who granted the motion on November 28, 2016. *See* Dkt. 61 (Order to Stay)]. The Court now addresses the Motion to Dismiss the Amended False Claims Act Complaint.

---

[1] Specifically, the employment action raises violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C §2000e *et seq.*; Conn. Gen. Stat § 31-51m; the Connecticut Fair Practices Act ("CFEPA"), codified as Conn. Gen. Stat. § 46a-60 *et seq.*.; intentional infliction of emotional distress; and wrongful discharge in connection with Plaintiff's employment termination. *See* [Dkt. 1, *Ameti v. Sikorsky Aircraft Corp.*, case no. 15-cv-235 (VLB) (D. Conn.) (*Ameti II*)].

[2] Plaintiff deleted reference to UTC in the section labeled, "Parties." *See id.* ¶¶6-7. However, Plaintiff addresses Counts I, II, and IV against "All Defendants." Of note, Plaintiff withdrew his Complaint against UTC in the employment discrimination action on March 26, 2015. *See* [Dkt. 10 (*Ameti II*)]. Defendant stated in the Joint Rule 26(f) Report, which was filed before the Amended Complaint, that Plaintiff has not served UTC and has indicated he will withdraw the Complaint against UTC. *See* [Dkt. 30 (Joint Rule 26(f) Report)]. As the Amended Complaint does not present any factual allegations against UTC, the Court dismisses the case as to UTC.

## II. <u>Facts</u>

Sikorsky is a leading defense contractor that designs and manufactures helicopters for use by all five branches of the United States armed forces, military services, and commercial operators in 40 nations. [Dkt. 51 ¶¶ 8-9]. In 2008, Ameti was hired as a Staff Engineer in the Blades Engineering Department at Sikorsky's Stratford, CT plant. *Id.* ¶ 10. He was transferred in November 2008 to the 53K group to work on the 53K main blade composite spar project overseen by Frank Caputo, 53K Group Lead. *Id.* ¶¶ 18-21. The project was completed in 2010. *Id.* ¶ 22. Thereafter Ameti was assigned to other projects behind schedule within the 53K group. *Id.* ¶ 23.

Around March 2012, Caputo became Design Group Lead and Richard Lay took over Caputo's position as 53K Group Leader. *Id.* ¶¶ 24-25. Ameti requested a transfer to a different group within Sikorsky, because he believed Caputo engaged in unfair and harassing behavior towards him in the past, and Lay transferred him from the design engineering group to the manufacturing engineering group led by Corey Jones, Manufacturing Engineering Group Lead. *Id.* ¶¶26-27. Kneil Northrop, Integrated Product Team ("ITP") Lead, became his immediate supervisor. *Id.* ¶ 28.

### A. *<u>Plaintiff's Allegations of Defective Root End Fairing Parts</u>*

Root end fairings are fiberglass details bonded onto the leading edge of helicopter blades to protect the blades' electrical connections from water intrusion. *Id.* ¶¶ 31-32. As the Contractor, Sikorsky subcontracted with GKN Aerospace, Inc. ("GKN"), whereby Sikorsky supplied tooling and designs to GKN and GKN in turn produced the root end fairings. *Id.* ¶ 34. While working as a manufacturing

engineer, Ameti came to believe the root end fairings produced by GKN were defective "(i) because they did not meet drawing requirements; (ii) their laminate quality was poor; and (iii) there were multiple defects and an incorrect trim line." *Id.* ¶ 35.

In the Amended Complaint, Ameti provides instances dating from May 2013 to January 2014 in which he notified others about his belief that the root end fairings were defective. *See id.* ¶¶ 36-40. For example, throughout this time period Ameti (1) emailed "multiple high-ranking Sikorsky employees" about "discuss[ing] a way to improve the defective GKN parts;" (2) he "informed" various Sikorsky managers, including his own, about particular defects pertaining to the fairings; and (3) he "informed" GKN of the same. *Id.* ¶¶ 36-37, 41-42. GKN agreed the fairings it supplied to Sikorsky was substandard, but stated the reason was because Sikorsky itself supplied old and substandard tooling to GKN. *Id.* ¶ 41. GKN recommended to Ameti that Sikorsky stop purchasing the defective parts and purchase fairings from another supplier. *Id.* ¶ 42. In response to Ameti's investigation, GKN requested $4,000 to improve its tooling but never received the funds from Sikorsky. *Id.* ¶ 46. Purchasing Manager, Maria Spencer, explained to Ameti that Sikorsky had a multi-year contract with GKN and its parts cost significantly less than other suppliers. *Id.* ¶ 45.

In addition to Ameti's allegations that Sikorsky supplied GKN "poor tooling," he avers the engineering drawings were "not up to date." *Id.* ¶ 47. Ameti filed several "turn-backs"—"written description[s] of a procedure failure"—in response to the outdated drawings. *Id.* ¶¶ 51-52. On January 24, 2014, Tim Conti, a design

engineer who had been assigned to correct drawing errors and release them to the manufacturing floor, spoke to Ameti and "implied that by filing a turn-back against his group, Plaintiff put his job in danger." *Id.* ¶¶ 48, 55. Jones, "while knowing of the defects about the fairings and [Ameti's] complaints about the defects, emailed a request that Ameti release defective parts from GKN that were set aside as defective so the parts could be used in production. *Id.* ¶ 58.

Ameti alleges that Sikorsky used GKN defective parts and certified the blades met drawing requirements "while knowing that these parts were not meeting drawing requirements and as such were defective." *Id.* ¶ 61. "Sikorsky falsely certified that the blades met drawing requirements and passed all quality inspections, both in-process and final inspection." *Id.* ¶ 65. "Upon information and belief, Sikorsky is still using the defective fairings on its blades." *Id.* ¶ 66. These defective blades were manufactured on Sikorsky helicopters, which were then sold to all five branches of the United States military. *Id.* ¶ 67.

### B. *Plaintiff's Allegations of Core Crush Issues*

In "mid-2013" Ameti and "other members of his group" also noticed the blades were being damaged by what is known as a "core crush." *Id.* ¶ 74. A core crush occurs when older tooling causes the blade to be improperly designed with respect to impact damage protection, and the blade is then crushed either during manufacturing when secondary parts are added or during the transportation between manufacturing units. *Id.* ¶ 76. Solumina is a Sikorsky system that can provide a list of damaged blades where a core crush is the defect. *Id.* ¶ 68. The query can provide the blade serial number and discrepancy report number, upon

which it can then be determined which employee wrote the process plan and performed the repairs and which inspector approved the repairs. *Id.* From January 27, 2012, until February 6, 2014, approximately 39 discrepancy reports were filed in Solumina. *Id.* ¶ 73.

Ameti noticed the core crush defects and submitted multiple "turn-backs" describing the core crush issue. *See id.* ¶¶ 80, 82-83. Ameti alleges that, rather than following process plans to properly repair damaged blades, "lead men" were "cutting corners to reduce time and lower the cost of repairs" by using "scrap skin" to bond the patch over the crushed core and thereby conceal it. *Id.* ¶ 84.

Sikorsky's Quality Assurance Department falsely certified that the blades met drawing requirements to satisfy the daily shipping requirements for the blades and to pass inspections. *Id.* ¶ 86. Sikorsky failed to follow proper procedure and cosmetically bonded over the crushed core. *Id.* ¶ 89. Sikorsky improperly repaired numerous blades for Black Hawk and Navy Hawk helicopters, which it sold to all five branches of the United States military. *Id.* ¶ 90. Sikorsky then billed the Government for the total job while using scrap skin as a patch and not following the bond control drawings. *Id.* ¶ 92. Ameti raised his concern with his supervisor and conducted a self-initiated "internal investigation" in January 2014, determining approximately 15 core crushes occurred per month; he sent this information to his supervisor, CC'ing others, on February 18, 2014. *Id.* ¶ 97.

After concluding his investigation, Ameti wrote a Report that stated the defects "were directly linked (1) to a specific tool on the Sikorsky manufacturing floor or (2) transportation dollies used by Sikorsky." *Id.* ¶ 102. Ameti circulated

the Report to multiple managers including his own. *See id.* ¶ 101-02. He then contacted outside tooling experts to obtain price quotes for different methods and conducted a cost-benefit analysis, concluding Sikorsky should invest in different tooling, "which would increase Sikorsky's profits in the future." *Id.* ¶ 105. Upon circulating this analysis to his supervisor, Ameti was told that "his group didn't have the financial support for new tools" but that he should enter the information in the Sikorsky's Cost Management System, designed as a cost cutting initiative. *Id.* ¶ 106.

On February 27, 2014, Ameti was escorted to Human Resources and unexpectedly terminated the next day. *Id.* ¶¶ 11, 116. Ameti alleges he was wrongfully terminated for reporting defective products. *Id.* ¶118. He further contends, "Sikorsky is obligated to provide safe, reliable, and quality tested products which perform to their specifications to the Government." *Id.* ¶ 120. "By delivering and receiving payment for Black Hawk and Navy Hawk helicopters with defective parts, Sikorsky is impliedly certifying compliance with the terms of its contract with the Government for the products and implying that the product met Government standards and were safe and reliable." *Id.* ¶ 121. Ameti believes he "attempted to prevent Sikorsky from continuing to submit false claims to the government by reporting its fraudulent misconduct to his superiors but Sikorsky took no steps to stop or remedy the fraud." *Id.* ¶ 122.

<u>**LEGAL STANDARD**</u>

**I.**   <u>**Motion to Dismiss**</u>

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may

be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## II. Pleading Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." While Rule 8 does not require detailed factual allegations, "[a] pleading that offers labels and conclusions or formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft*, 556 U.S. at 678 (internal quotation marks and citations). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557).

A complaint alleging fraud or mistake must satisfy the heightened pleading standard set forth under Rule 9(b) of the Federal Rules of Civil Procedure, which requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Rule 9(b) pleadings satisfy the particularity requirement when they "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (applying this standard to alleged violations

under 31 U.S.C. § 3729(a)(1)(A)-(C)); *see United States ex rel. Monda v. Sikorsky Aircraft Corp.*, No. 3:99CV1026 (JBA), 2005 WL 1925903, at *2 (D. Conn. Aug. 11, 2005) (citing Second Circuit standard and stating, "[o]ther courts have characterized this pleading standard as the 'who, what, when, where, and how' of the alleged fraud"). There are three main reasons why Rule 9(b)'s heightened pleading standard exists: (1) "to provide a defendant with fair notice of a plaintiff's claim;" (2) "to safeguard a defendant's reputation from improvident charges of wrongdoing;" and (3) "to protect a defendant against the institution of a strike suit." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991).

## ANALYSIS

### I. Violations of the False Claims Act (Counts I and II)

Plaintiff alleges Defendants defrauded the United States Government in violation of the False Claims Act ("FCA"). Section 3729 of the FCA imposes liability on a defendant[3] who, in relevant part, "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of subparagraph (A) [or] (B). . . ." 31 U.S.C. § 3729(a)(1)(A)-(C). A "claim" is a direct request or reimbursement request made to an entity receiving federal funds under a federal benefits programs. *See* 31 U.S.C. § 3729(b)(2); *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016) (interpreting § 3729(b)(2)). "Knowing"

---

[3] Although the language in § 3729(a)(1) confers liability on "any person," the United States Supreme Court has held that the statute imposes liability on corporations as well. *Cook Cty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 125-26 (2003).

and "knowingly" includes "actual knowledge," "deliberate ignorance," or "reckless disregard" of the truth or falsity of information.  31 U.S.C. § 3729(b)(1).  "'[M]aterial' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

"It is self-evident that the FCA is an anti-fraud statute," and the heightened pleading standard therefore applies.  *Gold v. Morrison-Knudsen, Co.*, 68 F.3d 1475, 1476 (2d Cir. 1995).    To prove an FCA violation under § 3729(a)(1), a plaintiff must show that the defendant "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury."  *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001) (applying this standard to 31 U.S.C. §3729(a)(1)(A), (B), and (C)), *abrogated on other grounds by Universal Health Servs., Inc.*, 136 S. Ct. at 2001.   The complaint must contain details identifying the particular false claims submitted to the government for payment, such as the following: "details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the  amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices."  *United States ex rel. Chorches v. Am. Medical Response, Inc.*, No. 3:12-cv-921 (MPS), 2015 WL 6870025, at *8 (D. Conn. Nov. 6, 2015) (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 233 (1st Cir. 2004), *abrogated on other grounds by United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 59 n.8 (1st Cir. 2017)).  While this information is not a mandatory

checklist, at least some of the information must be included in the complaint to satisfy Rule 9(b). *See id.* Ultimately, the plaintiff "must plead the submission of false claims with a high enough degree of particularity that defendants can reasonably identify particular false claims for payment that were submitted to the government." *Id.* at *9 (quoting *Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 260 (S.D.N.Y. 2014)).

### A. *Count I: 31 U.S.C. § 3729(a)(1)(A),(B)*

Defendant argues that the facts pleaded by Plaintiff in support of his claim that it made false claims in violation of 31 U.S.C. § 3729(a)(1)(A),(B) (Count I), fail to constitute the specificity necessary to satisfy the plausibility and particularity standard required under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure because the Amended Complaint is "devoid of any details about any claim for payment to the Government or any requirement in any contract between Sikorsky and the Government." [Dkt. 53-1 (Mot. Dismiss) at 9]. Defendants also contend that the Amended Complaint must be dismissed because Plaintiff similarly cannot identify any information about the contracts or contractual requirements.

Plaintiff posits that he has satisfied the "relaxed" Rule 9(b) pleading standard that applies when the "factual information needed to fill out a plaintiff's complaint lies within the opposing party's knowledge." [Dkt. 59 (Opp'n Mot. Dismiss) at 8]. Instead, Plaintiff believes he should be permitted to take discovery

because he has pleaded enough factual details to give rise to "a strong inference of fraudulent intent" pursuant to the relaxed standard.[4] *Id.* at 9-10.

### 1. *The Complaint Fails to Satisfy the Pleading Standard*

The Court agrees with the Defendant. Ameti's FCA claim does not satisfy the heightened pleading standard because he does not provide the Court with any specifics about any alleged "false claim." In particular, he has not pleaded the specific contract involved, the specific date on which a violation occurred, any specific blade or batch of blades which was defective, or even the specific military branch to which any defective part was sold. Moreover, he does not identify any particular false claim submitted to the Government, who made the false claim or when the false claim was allegedly made. Plaintiff fails to satisfy the pleading standard despite alleging that he was integrally involved in the manufacturing process and defect detection and assessment.

A plaintiff may not succeed under Rule 9(b) by "alleging a fraudulent scheme in detail and concluding, that as a result of the fraudulent scheme, false claims must have been submitted." *Kester*, 23 F. Supp. 3d at 253 (quoting *United States ex rel. Polansky v. Pfizer, Inc.*, No. 04-cv-0704 (ERK), 2009 WL 1456582, at *5 (E.D.N.Y. May 22, 2009)). This is exactly what Ameti does here. For example, he could have included (but did not) the dates of the claims, the content of the bills, the identification numbers, the charged amount, particular goods or services billed, and the length of time between the fraudulent practices and submitted bills.

---

[4] In advocating for a "relaxed" Rule 9(b) pleading standard, it appears that Plaintiff acknowledges he does not satisfy the heightened pleading standard.

*Chorches*, 2015 WL 6870025, at *8-9.  Although there is no "mandatory checklist" requiring Ameti to plead specific information, he provides *zero* details identifying particular false claims and instead concludes fraudulent bills must have been submitted.[5]  *Id.*  At best, Plaintiff alleges a course of conduct or scheme which he assumes culminated with the submission of claims.

Importantly, in 2005 Judge Arterton dismissed a similar FCA case against Sikorsky based on a claim that identified a "1992 Black Hawk contract with the government" without providing specifics on the allegedly fraudulent claims.  *See Monda*, 2005 WL 1925903, at *4, *aff'd*, 207 F. App'x 28 (2d Cir. 2006).  While the plaintiff in *Monda* was able to describe the government contract, the arrangements to sell the helicopters, the governing federal regulations, the "suspect accounts," and Sikorsky's history of improper billing, plaintiff "admit[ted] that he [did] not have copies of or specific knowledge about the progress bills that Sikorsky allegedly submitted."  *Id.*  The court dismissed the claim and the case upon finding the plaintiff could not provide details of any compliance failure or "how specific progress bills were submitted in a manner inconsistent with the relevant regulations."  *Id.* at *4-5.  Here, Ameti fails for the same reasons and more.  Ameti's conclusory allegations are even less specific than those found wanting in *Monda* and do not satisfy the heightened pleading standard.

---

[5] Plaintiff's contention that there exists repair work orders with signatures and dates do not address the particularity requirements because work orders are not claims submitted to the Government.  *See* [Dkt. 51 ¶ 68].  Similarly, his contention that 39 discrepancy reports were filed between January 27, 2012, and February 6, 2014, does not speak to any fraudulently filed claims because discrepancy reports are part of the internal quality control system.

The decision in *Monda* is consistent with other cases in this circuit dismissing and upholding dismissal of cases in which the plaintiff failed to plead with specificity that a false claim was actually made*.* In *Ladas*, 824 F.3d at 27, the Second Circuit upheld the dismissal of an FCA case where the complaint did not show any submitted claim was false or that the device delivered to Government failed to satisfy the contract. Likewise in *United States ex rel. Scharff v. Camelot Counseling*, No. 13-cv-3791 (PKC), 2016 WL 5416494, at *7-8 (S.D.N.Y. Sept. 28, 2016), the court dismissed the FCA claim where the plaintiff made no allegations relating to any submission of a false claim, did not attach a sample of a false claim, and did not describe the contents or format of the reimbursement claims.

The complaint would not survive scrutiny even assuming the relaxed pleading standard applied. To date the Second Circuit has not set forth any binding precedent elucidating whether the "relaxed" pleading standard applies in FCA cases. *See generally, United States ex rel. Monda v. Sikorsky Aircraft Corp.*, 207 F. App'x 28, 29 (2d Cir. 2006) ("Even if we were to find that a *qui tam* relator may benefit from a relaxed pleading standard under Fed. R. Civ. P. 9(b), <u>a proposition on which we express no opinion</u>, our case law requires plaintiffs proceeding under the relaxed standard to allege facts that would support a "strong inference of fraud.") (emphasis added); *Wood ex rel. United States v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 747 n.1 (2d Cir. 2009) (noting plaintiff, in failing to allege facts were peculiarly within the opposing party's knowledge, did not plead facts sufficient to warrant application of the "relaxed" pleading standard). Were it to do so, a "relaxed" Rule 9(b) pleading standard is appropriate only when the

information is "peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990); *see Wood*, 328 F. App'x. at 747 n.1 (acknowledging *Wexner* but not applying the standard to an FCA claim); *Chorches*, 2015 WL 6870025, at *11 (D. Conn. Nov. 6, 2015). But where this is the case the plaintiff must also "plead the factual basis which gives rise to a strong inference of fraudulent intent." *Wexner*, 902 F.2d at 172. Pleading scienter by inference is not, however, to be "mistaken for license to base claims of fraud on speculation and conclusory allegations." *Id.* (internal quotation marks omitted). Ample facts are required as Rule 9(b) is intended "to discourage the filing of complaints as a pretext for discovery of unknown wrongs." *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989); *Wood*, 328 F. App'x at 747 (2d Cir. 2009) (same). Accordingly, a plaintiff may not contend "that discovery will unearth information tending to prove his contention of fraud" as that is "precisely what Rule 9(b) attempts to discourage." *Madonna*, 878 F.2d at 66. Pleadings based on "information and belief" are likewise subject to the particularity requirements of Rule 9(b) even where the relaxed standard applies. *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 83 (D. Conn. 2006). A plaintiff cannot assert allegations "based on information and belief" without showing a "strong inference of fraud." Wexner, 902 F.2d at 172; Wood, 328 F. App'x 747 n.1 (determining the "relaxed" pleading standard did not apply where the plaintiff did not assert any facts "peculiarly within the knowledge" of the defendant).

Notwithstanding the uncertainty surrounding the application of the "relaxed" pleading standard, Ameti has not presented facts showing a "relaxed"

pleading standard would be availing. The "relaxed" pleading standard still requires a plaintiff to provide some detail about the fraudulent claims. See *Smith*, 415 F. Supp. at 86-87 ("If Relator is unable to identify a single false claim from the alleged scheme of fraud or at least set forth an adequate basis on which his belief is based, he cannot even meet a 'bare-bones Rule 9(b) test.'"); *Chorches*, 2015 WL 6870025, at *12 (finding a plaintiff did not meet the "relaxed" Rule 9(b) pleading standard due to the failure to "plead the factual basis for the relator's belief that 'Medicare was billed'"). Ameti acknowledges he is not in possession of the claims or contracts *See Wexner*, 902 F.2d at 172. Ameti alleged he was integrally involved in the manufacture of the allegedly defective produces and that he conducted an investigation into the causes of the defects and identified a solution. Despite this intimate knowledge, the complaint fails to identify any defective blade, any date on which a defective blade was manufactured or sold to the Government or any individual involved in the manufacture or sale of a defective blade. Plaintiff does not even allege to have any personal knowledge of a fraudulent sale of a defective blade to any governmental entity. The complaint alleges only that "[u]pon information and belief, in 2013, approximately 70 blades were improperly repaired and an average of approximately 20 blades per/month [sic] for the first two months of 2014. While he alleges he informed his colleagues about blade manufacturing problems, he does not allege that he informed them of these particular blade defects. The complaint does not allege sufficient facts to create a strong inference of fraud, much less fraudulent intent.

In addition, Ameti fails to show how the information needed to meet the heightened pleading standard is so "peculiarly within Sikorsky's knowledge" to warrant the application of a relaxed pleading standard. He alleges that he was involved in the manufacture of the defective blades, issued turn-backs of defective blades, informed his superiors and co-workers of the defects, investigated the cause of the defects, spoke with Sikorsky's outside vendors about the defects and their causes, discussed with those vendors solutions to the problem, and prepared and submitted to his supervisors a report discussing the defects, their cause and the retooling necessary to solve the problem. In view of his alleged intimate knowledge of the alleged fraud, Ameti has failed to show only Sikorsky has access to information necessary to meet the Rule 9 pleading standard.

Finally, Plaintiff avers that he believes that through discovery he can obtain details about the bills and contracts which are solely in possession of the Defendant. [Dkt. 59 at 11]. Plaintiff has not explained how discovery of Sikorsky's records on the basis of such vagaries could be proportional much less lead to the discovery of contracts or bills which support his fraud claim. In the absence of a strong inference of fraud, discovery would be nothing more that the fishing expedition Rule 9(b) aims to prevent. *See Madonna*, 878 F.2d at 66. The Court therefore holds that the "relaxed" pleading standard does not apply on the facts of this case.

## 2. *Plaintiff's Legal Falsity Theory*

Ameti contends that Sikorsky falsely certified the blades met drawing requirements in disregard of the defects despite "cutting corners" to reduce time

and lower costs. [Dkt. 51 ¶¶ 86, 127-28]. Ameti also alleges that "[b]y delivering and receiving payment for Black Hawk and Navy Hawk helicopters with defective parts, Sikorsky is impliedly certifying compliance with the terms of its contract with the Government for the products and implying that the product met Government standards and were safe and reliable." [Dkt. 51, ¶ 121]. Accordingly, the Court acknowledges there may be some uncertainty worth addressing as to whether Plaintiff alleges FCA violations due to express or implied false certifications of contractual compliance.

The FCA is "not designed to reach every kind of fraud practiced on the Government" but does make actionable a claim that is either "expressly" or "impliedly" legally false. *See id.* An "expressly false" claim is one that "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *Mikes*, 274 F.3d at 697-98. An "impliedly false" claim, in contrast, is one where the defendant "submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Universal Health Servs., Inc.*, 136 S. Ct. at 1995; *United States ex rel. Kolchinsky v. Moody's Corp.*, No. 12cv1399, 2017 WL 825478, at *5 (S.D.N.Y. Mar. 2, 2017) ("Under an FCA theory of implied legal falsity, a relator alleges that the 'very submission' of the defendant's claim for payment to the Government implicitly constitutes a certification of compliance with certain applicable regulations.").

Whether the Amended Complaint asserts a theory of express or implied certification is irrelevant because it fails to state with particularity any details identifying a governing contract or false claims. The Court cannot evaluate the means by which a defendant commits an FCA violation if there is insufficient information to determine whether a violation occurred. Therefore, the Court finds Ameti's claim would fail under either theory of legal falsity. *See Mikes*, 274 F.3d at 697-98 (imposing liability for express false certification of a *particular* statute, regulation or contractual term); *Universal Health Servs., Inc.*, 136 S. Ct. at 2001 (requiring a claim to make "specific representations about the goods or services provided" and for the misrepresentation to be material).

### B. *Count II: 31 U.S.C. § 3729(a)(1)(C)*

Section 3729(a)(1)(C) provides for civil penalties where a defendant "conspires to commit a violation of subparagraph (A) [or] (B). . . ." 31 U.S.C. § 3927(a)(1)(C). Like the Count I allegations, the Amended Complaint fails to satisfy the pleading requirements under Rule 9(b) with respect to the conspiracy claim. *See United States v. New York Soc. for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for Special Surgery*, No. 07 Civ. 292 (PKC), 2014 WL 3905742, at *25 (S.D.N.Y. Aug. 7, 2014) (requiring conspiracy under the FCA to be pleaded with particularity under Fed. R. Civ. P. 9(b)) (citing *United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009)); *United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94-CV-2063 (EBB), 2000 WL 1336487, at *11 (D. Conn. Aug. 24, 2000) (stating that "general allegations of conspiracy do not meet the

particularity standard required by Fed. R. Civ. P. 9(b)); *Kolchinsky*, 162 F. Supp. 3d at 193, 195 (applying Rule 9(b) to conspiracy under the FCA).

The Amended Complaint does not "identify a specific statement where [the co-conspirators] agreed to defraud the government." *See Ladas*, 824 F.3d at 27 (upholding dismissal made on these grounds) (internal quotation marks omitted); *Scharff*, 2016 WL 5416494, at *9 (finding FCA conspiracy allegation failed to satisfy Rule 9(b) when the complaint made "no allegations as to the existence of any agreement to violate the FCA"); *Capella*, 2000 WL 1336487, at *11 (dismissing conspiracy claim where plaintiff "merely allude[d] to an agreement without specifying the particulars). Indeed, Ameti presently cannot even identify who are the co-conspirators, but claims that he will do so after discovery. *See* [Dkt. 59 at 13-14]. Accordingly, Count II must be dismissed.

## II.    Retaliation under the False Claims Act (Count III)

Plaintiff also alleges Defendants retaliated against him in violation of the FCA's "whistleblower" provision, 31 U.S.C. § 3730(h). Section 3730(h)(1) provides that an employee is entitled to relief if he "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

The Second Circuit has not yet articulated the standard for determining when a plaintiff has sufficiently pleaded a retaliation claim under 31 U.S.C. § 3730(h). *See Weslowski v. Zugibe*, 626 F. App'x 20, 22 (2d Cir. 2015) (electing not to articulate

the standard for establishing a retaliation claim under § 3730(h) because the plaintiff did not adequately allege the defendant was aware that plaintiff's refusal to approve the contract was to prevent an FCA violation); *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 297 n.11 (E.D.N.Y. 2016) (noting the Second Circuit has not established a retaliation standard under § 3730(h)).  District courts within this circuit generally require "a plaintiff to establish: "(1) the employee engaged in conduct protected under the FCA; (2) the employer knew that the employee was engaged in such conduct; and (3) the employer discharged, discriminated against or otherwise retaliated against the employee because of the protected conduct."  *Smith*, 415 F. Supp. 2d at 102; *see N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 297 (citing New York district court cases).  The retaliation provision does not require the plaintiff to plead with particularity under Rule 9(b) because "no showing of fraud is required."  *Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 297.

Defendants argue that Plaintiff failed to satisfy all three factors required to establish a retaliation claim under 31 U.S.C. § 3730(h).  First, Defendants posit Plaintiff failed to engage in protected activity because his "internal complaints focused on internal quality processes and suggestions for improvement and made no mention of fraud."  [Dkt. 53-1 at 24].  Second, should the Court find Plaintiff did engage in protected activity Defendants believe he nonetheless fails to set forth facts showing Defendants had knowledge he engaged in protected conduct.  *Id.* at 25.  As a result, Defendants contend that Plaintiff cannot show "but-for causation" as required by the third factor.  *Id.* at 26.

Plaintiff disagrees. First, Plaintiff states his reports on the defective fairings and core crushes constitute protected activity because such information were calculated or reasonably could have led to a viable FCA claim. [Dkt. 59 at 14]. Second, Plaintiff argues the information in his reports means the Defendants knew the Black Hawks and Navy Hawk helicopters were defective and were being sold to all military branches at full price. *See id.* at 16. Third, Plaintiff contends he is allowed to plead alternate theories of recovery and despite his past poor performance, he could have still been terminated for engaging in protected activity.

### A. *Factor 1: Protected Conduct*

To establish the plaintiff engaged in "protected conduct," he "need only have engaged in conduct 'in furtherance of' an FCA action." *Smith*, 415 F. Supp. 2d at 102. Conduct "in furtherance of" an FCA action is broadly interpreted as "conduct that was calculated to, or reasonably could lead to a viable FCA action." *Id.* at 103. This includes investigations, inquiries, testimonies, internal reporting, objecting to employer directives, or "other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *Karvelas*, 360 F.3d at 237; *Booker*, 847 F.3d at 59 n.8 (citing *Karvelas* and clarifying that the same standard applies subsequent to the 2010 amendment of this provision). A plaintiff is not required to have filed an FCA lawsuit or develop a winning claim. *Smith*, 415 F. Supp. 2d at 102. Rather, courts typically find the first prong to be satisfied when the plaintiff engages in action creating a "distinct possibility" of evidence of an FCA violation; ultimate failure to find such evidence is immaterial to the retaliation claim. *Id.* at 103. A plaintiff also need not

23

contemplate an FCA suit to engage in conduct in furtherance thereof, but "must at least demonstrate that his or her investigation, inquiries and complaints were conducted with the purpose of exposing a fraud upon the government." *Id.*; *Grant v. Abbott House*, No. 14-cv-8703 (NSR), slip op. at 7 (S.D.N.Y. Feb. 22, 2016) (finding the Amended Complaint lacked allegations that plaintiff conducted investigation to expose fraud upon the Government). Ultimately, it is the "function or effect and not the intent of the actor" that should determine whether the acts were "in furtherance of" an FCA action. *Smith*, 415 F. Supp. 2d at 103.

It is clear Ameti believed Sikorsky was producing defective blades. He conducted an investigation on GKN's defective root end fairings, [Dkt. 51 ¶ 35], filed turn-backs into Sikorsky's Quality Control Process Clinic ("QCPC"), *see, e.g., id.*¶ 54, conducted an internal investigation on the cause of core crushes and wrote an associated report, *id.* ¶¶ 96-102, and conducted a cost-benefit analysis about investing in better tooling, *id.* ¶ 105. Nowhere in the Amended Complaint, however, is there any reference that such investigations or reports were designed to expose fraud upon the Government. Instead the turn-backs were a normal quality control process conducted at Sikorsky. The apparent purpose of Ameti's investigation and report was to inform his superiors how to improve the quality of Sikorsky's manufacturing process. The Court thus finds Ameti did not engage in "protected activity" within the meaning of § 3730(h). Notwithstanding this conclusion, the Court will address the second factor.

## B. *Factor 2: Knowledge*

For a plaintiff to show the defendant has knowledge of the protected activity, he must adequately allege the defendant was aware the employee was engaged in protected activity. *See Weslowski*, 626 F. App'x at 22; *see Smith*, 415 F. Supp. 2d at 105 ("All that Defendant must have known is that Relator was engaged in protected activity—that is, investigation of other activity concerning potentially false or fraudulent claims that could reasonably lead to a FCA case." *Smith*, 415 F. Supp. 2d at 105. This does not mean the employer must know the employee is contemplating an FCA action. *Id.* But where a plaintiff seeks to impute knowledge on the defendant, "he must specifically tell the employer that he is concerned about possible fraud." *Id.* Put another way, the plaintiff must do something to put the defendant on notice that his actions are in furtherance of an FCA action. *See Weslowski*, 626 F. App'x at 22. Situations where a plaintiff makes an investigation or internal complaint is insufficient if there is no allegation of actual fraud. *Smith*, 415 F. Supp. 2d at 105.

Ameti fails to establish Sikorsky's knowledge for the same principle resulting in his failure to establish "protected activity," i.e. he communicated information about defective products but did not alert anyone about fraud. For example, he wrote an email to "high-ranking Sikorsky employees stating that he needs to discuss a way to improve the defective GKN parts." [Dkt. 51 ¶ 36]. He notified his manager, Jones, and other managers about the fairing defects. *See, e.g., id.* ¶ 43. Ameti took similar action with respect to the core crushes whereby he emailed Jones multiple times about the core crushes and wrote a report, which

he also circulated to Jones, but he did not discuss any potential for fraud.  *See id.*
¶ 81.  Although the Amended Complaint states, "Realtor [sic] attempted to prevent
Sikorsky from continuing to submit false claims to the government by reporting its
fraudulent misconduct to his superiors but Sikorsky took no steps to stop or
remedy the fraud," *id.* ¶ 122, such a conclusory allegation is not supported by the
facts.  Instead his efforts are more properly characterised as being detected
towards quality improvement and not fraud accusation.  The Court cannot impute
knowledge upon the Defendant where there are no specifics putting the Defendant
on notice of actual fraud.

**C.** <u>Factor 3: Nexus</u>

Lastly, a plaintiff must allege he was retaliated against *because of* his
engagement in protected conduct and provide sufficient facts to support this claim.
Facts must show direct termination or an intentionally created work atmosphere
so intolerable it forced the plaintiff to involuntarily quit.  *See N. Adult Daily Health
Care Ctr.*, 205 F. Supp. 3d at 299 (citing *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d
Cir. 2003)).  In failing to establish the first two factors, Ameti cannot prevail on the
third.  Accordingly, the Court dismisses the retaliation claim.

**III.**   <u>State Retaliation Claim (Count IV)</u>

The Court will not exercise supplemental jurisdiction of Ameti's free speech
retaliation claim under Conn. Gen. Stat. § 31-51q and therefore dismisses it without
prejudice.

## <u>CONCLUSION</u>

For the aforementioned reasons, Defendant's Motion to Dismiss is GRANTED. The counts are also DISMISSED against UTC as the Amended Complaint asserts no factual allegations against this Defendant.

IT IS SO ORDERED.


_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut:  June 19, 2017**