## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PELLUMB AMETI, ex rel. | : | |
| UNITED STATES, | : | |
| *Plaintiff*, | : | CIVIL CASE NUMBER: |
| | : | |
| v. | : | 3:14-cv-1223 (VLB) |
| | : | |
| SIKORSKY AIRCRAFT CORP., | : | February 6, 2018 |
| *Defendant*. | : | |

## MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT [DKT. 66]

Before the Court is Defendant Sikorsky Aircraft Corporation's ("Defendant" or "Sikorsky") summary judgment motion of Plaintiff Pellumb Ameti's ("Plaintiff" or "Ameti") employment termination case.[1]  Mr. Ameti brings claims of unlawful discrimination and hostile work environment based on race, national origin, and religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, *et seq.*, and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(a)(1); retaliation in violation of Conn. Gen. Stat. § 31-51m; intentional infliction of emotional distress; and common law wrongful discharge in violation of an important public policy.  For the foregoing reasons, the motion for summary judgment is GRANTED as to Counts I through IV, and the Court declines to exercise supplemental jurisdiction over Counts V through VII.

---

[1] This employment termination case initially held the case number 15-cv-00235 but was consolidated with Plaintiff's False Claims Act ("FCA") case, case number 14-cv-01223.  The Court dismissed the FCA case on June 19, 2017.  *See* [Dkt. 62 (Mem. Decision FCA Case)].  Accordingly, only the employment termination case remains.

## I.  Background

Sikorsky is a company that designs, manufactures, and services helicopters for commercial, industrial, and military uses.  [Dkt. 66-24 (Def. L. R. 56(a)(1) Statement) ¶ 1; Dkt. 79-1 (Pl. L. R. 56(a)(2) Statement) ¶ 1].  The company has policies that prohibit discrimination and harassment on the basis of color, national origin, and religion.  [Dkt. 66-24 ¶ 3; Dkt. 79-1 ¶ 3].  These policies provide a procedure for individuals who believe they are subject to discrimination or harassment.  *See* [Dkt. 66-24 ¶ 3; Dkt. 79-1 ¶ 3].  Specifically, the harassment policy states, "If you have witnessed or been the victim of harassment, you should immediately notify the Company through one or more of the following: (1) your supervisor (unless he/she is the alleged harasser or (2) your EEO representative, Diversity manager or Human Resources representative."  [Dkt. 66-24 ¶ 100; Dkt. 79-1 ¶ 100].  The policy also prohibits retaliation against anyone who reports harassment or cooperates in a harassment investigation, and it specifies that an investigation confirming harassment will lead to disciplinary action that may include the employee's termination.  [Dkt. 66-24 ¶ 101; Dkt. 79-1 ¶ 101].

Mr. Ameti began working for Sikorsky in 2008 as an engineer in the Blades Product Center.  [Dkt. 66-24 ¶ 4; Dkt. 79-1 ¶ 4].  He is from Macedonia and Albania and has a darker complexion, which he believes suggests he is from the Middle East.  [Dkt. 80 (Opp'n Ex. S, Ameti Dep.) at 70:8-17].

Each year Mr. Ameti received a Performance Feedback Tool ("PFT"), which was a retrospective assessment of his performance during the previous year.

[Dkt. 66-24 ¶ 11; Dkt. 79-1 ¶ 11].  The PFT summary ratings were the following: Unsatisfactory Performance / Improvement Required ("U"); Progressing ("P"); Fully Competent Performance ("FC"); and Exceptional Performance ("EP").  [Dkt. 79-3 (Opp'n Ex. F-S, Ex. H; Ameti PFTs) at SIK000693].  He received an overall summary rating of FC every year from 2008 through 2012.[2]  Mr. Ameti did not receive the 2013 PFT before he was laid off, but there is an unsigned draft that indicates he received an overall rating of FC for the sixth time.  [Dkt. 66-24 ¶¶ 16-17; Dkt. 79-1 ¶¶ 16-17].

## A. *Caputo's Supervision (2008 Through First Quarter of 2011)*

From November 2008 through the first quarter of 2011, Mr. Ameti was supervised by Frank Caputo.  [Dkt. 66-24 ¶¶ 5-6; Dkt. 79-1 ¶¶ 5-6].

Mr. Ameti testified that in either 2010 or 2011, Mr. Caputo came to his desk and told him "that he saw some kind of information somewhere about an Albanian tradition where some of the female family members of the family where there was no male party in the family, they were allowed to live their life as a male so they can take care of the family, and that was very strange and primitive thing for nation to do that."  [Dkt. 80 at 35:15-22].

Mr. Ameti attests that he received a "below average" raise for the year 2011.  [Dkt. 79-3 ¶ 12].  He does not indicate the value of his raise, against whom he compared his raise, the value of an average raise, and what a raise was based

---

[2] Mr. Leon Meyer issued the PFT for 2008.  *See id.* at SIK00000709.  Mr. Caputo issued the PFTs for 2009 and 2010.  *See id.* at SIK00000702-708.  Both Mr. Caputo and Mr. Richard Lay issued the 2011 PFT (Mr. Caputo as the former supervisor and Mr. Lay as the current supervisor).  *See id.* at SIK00000698-701.  Mr. Lay and Mr. Corey Jones issued the 2012 PFT.  *See id.* at SIK00000694-697.

on. His affidavit reads as follows: "At this time, Plaintiff noticed that Caputo was treating him disparately." *Id.*

## B. *Jones's Supervision (First Quarter of 2011 Through Layoff)*

This supervision ended when Mr. Caputo became the Chief Engineer for the Blades Product Center, and at that point Mr. Ameti was transferred to a group led by Corey Jones. [Dkt. 66-24 ¶ 7; Dkt. 79-1 ¶ 7]. Mr. Ameti then began working with another Manufacturing Engineer named Michael Tabone. *See* [Dkt. 79-1 ¶ 153; Dkt. 80 at 87:13-88:10].

Mr. Tabone's comments constitute the bulk of alleged discriminatory comments. Mr. Ameti testified that Mr. Tabone said, "This is Pellumb Ameti, and he is Muslim," at least five times to other people, including to David Caywood, Kneil Northrop, Mike Liggen, and two others. *See* [Dkt. 80 at 38:2-10; Dkt. 82 (Mot. Summ. J. Ex. S Cont'd, Ameti Dep.) at 262:22-265:15]. He also asked Mr. Jones, "Do you know that Pellumb is Muslim?" on another occasion. *See* [Dkt. 80 at 38:11-15]. Mr. Tabone asked Mr. Ameti how many wives he had approximately five times. [Dkt. 82 at 274:14-17]. Mr. Ameti estimates that between two to five times Mr. Tabone told their coworker, Ms. Joanne Pavia, "Pellumb has three wives and for a Muslim that is normal." *Id.* at 275:24-276:4]. Mr. Ameti also testified that Mr. Tabone referred to Muslims as terrorists between three to five times, and he believes Ms. Pavia heard on one occasion. [Dkt. 82 at 278:21-279:7; *see* Dkt. 80 at 38:11-16]. Subsequently in mid-2013, Ms. Pavia asked Mr. Ameti if he owned a gun. [Dkt. 82 at 276:5-12]. Mr. Ameti never filed a formal complaint about Mr. Tabone's comments. [Dkt. 66-24 ¶ 20; Dkt. 79-1 ¶ 20]. Although Mr.

4

Ameti approximated the number of times Mr. Tabone said these remarks, he did not provide approximate dates when they occurred.

It is undisputed that Mr. Tabone was not a decision-maker with respect to Mr. Ameti's layoff. [Dkt. 66-24 ¶ 94; Dkt. 79-1 ¶ 94]. However, Mr. Ameti describes Mr. Tabone and Mr. Caputo as being very close friends, [Dkt. 80 at 38:3-9], and it is Mr. Ameti's opinion that Mr. Tabone "spoke directly to Caputo about [his] Muslim religion and background," [Dkt. 79-3 (Opp'n Ex. F-S, Ex. F; Ameti Aff.) ¶ 10]. He does not profess to have heard this alleged conversation, however. Mr. Caputo submitted a declaration in which he stated he was not aware of Mr. Tabone's comments about Mr. Ameti's religion while Mr. Ameti worked for Sikorsky. [Dkt. 66-3 (Mot. Summ. J. Ex. 1, Caputo Decl.) ¶ 7].

Mr. Ameti also describes comments in which coworker, Kevin Leahy, told Mr. Ameti, "I see you came from another country; see how we gave you a job; we pay you." [Dkt. 80 at 72:15-21, 89:2-90:15]. It is unclear based on the testimony the number of times and when Mr. Leahy made these statements.

There are some circumstances in which Mr. Ameti claims he did not receive credit for his work. Mr. Ameti claims that another coworker, Carol Perkins, got credit for four to five designs that he created [Dkt. 82-4 at 425:13-21]. He did not complain to anyone about this issue. *Id.* at 426:25-27:1. He also complains that his name was left off a patent, but after raising this issue with Mr. Caputo he "accepted the error" and his name was added to the patent. [Dkt. 80 at 39:1-40:12]. He believes this example evidences Mr. Caputo's dislike for him because he is Muslim, that leaving him off the patent is part of a "whole pattern, starting

from the comments and different other comments," and that the pattern shows he "was not treated as the rest of the engineers within the group." *Id.* Mr. Ameti did not provide a date for either issue.

C. *Reduction in Force (February 2014)*

In February 2014, Sikorsky experienced a decrease in customer demand, which required a company-wide reduction in force. [Dkt. 66-24 ¶ 63; Dkt. 79-1 ¶ 63]. This reduction in force aimed to address economic issues, an EBIT gap, and structural issues; it sought to retain the best talent while realigning the business. [Dkt. 66-24 ¶ 64; Dkt. 79-1 ¶ 64]. In order to evaluate who would be laid off, managers were asked to rate and rank salaried employees according to an Employee Assessment Matrix ("Assessment Matrix") for which they received a training. [Dkt. 66-24 ¶ 66; Dkt. 79-1 ¶ 66; Dkt. 66-14 (Mot. Summ. J. Ex. 12, Sealed)]. According to the Assessor Training and Employee Assessment Guidelines ("Assessment Guidelines"), an assessment was to be prospective so as to determine "the ability of the employee to perform under current and projected business conditions." [Dkt. 66-24 ¶¶ 67-68; Dkt. 79-1 ¶¶ 67-68]. These assessments were to be measured on five factors: (1) Achieve Results (1-10); Criticality of Skills (1-10); Qualifications (1-5); Business Orientation (1-5); and Interpersonal Skills (1-5). [Dkt. 66-24 ¶ 70; Dkt. 79-1 ¶ 70]. Each employee was to be assessed in comparison with other employees who held the same position and labor grade. [Dkt. 66-24 ¶ 72; Dkt. 79-1 ¶ 72]. The Assessment Guidelines also indicated the process was not intended to rely on past performance evaluations such as the PFTs, which were "retrospective looking and used

primarily as development tools and as one of the criteria used to distribute merit increases and other forms of compensation." [Dkt. 66-24 ¶ 74; Dkt. 79-1 ¶ 74].

Mr. Caputo used the Assessment Guidelines factors to assess 55 employees in the Blades Product Center, including Mr. Ameti. [Dkt. 66-24 ¶ 77; Dkt. 79-1 ¶ 77]. He testified that he was knowledgeable about the group and relied on assessments he previously received. [Dkt. 66-24 ¶¶ 79-80; Dkt. 79-1 ¶¶ 79-80]. In addition, he spoke with Mr. Jones about Mr. Ameti and the other people in Mr. Jones's group. [Dkt. 66-24 ¶ 81; Dkt. 79-1 ¶ 81]. Mr. Jones recalls that he told Mr. Caputo, "[P]art of the issues with Pellumb was that as an ME you need to spend time on the shop floor, you need to own the process. You need to get involved, and Pellumb as a designer, in my opinion, at this time was that, you know, he wanted to do more Catia work. He was more of a desk person, which is not conducive to ME work." [Dkt. 66-6 (Mot. Summ. J. Ex. 4, Jones Dep.) at 90:3-11]. Mr. Caputo testified that he felt Mr. Ameti's design engineering skills were lacking, [Dkt. 66-5 (Mot. Summ. J. Ex. 3, Caputo Dep.) at 93:8-23], and that Mr. Ameti made mistakes and relied on coworkers to correct them, *id.* at 136:16-23. Out of all 55 employees assessed by Mr. Caputo, Mr. Ameti and another engineer named Marco Salazar received the lowest scores. [Dkt. 66-24 ¶ 88; Dkt. 79-1 ¶ 88].

Michael Ambrose, Vice President of Aircraft Design & Manufacturing Engineering, and Alan Walling, Blades Product Center General Manager, thereafter evaluated the assessments. [Dkt. 66-24 ¶ 78; Dkt. 79-1 ¶ 78]. The exact time frame during which the assessment and reviews were made is murky. On an unspecified date, Mr. Ambrose reviewed Mr. Ameti's assessment and thereafter

changed some of the scores.  [Dkt. 66-24 ¶ 91; Dkt. 79-1 ¶ 91].  Mr. Caputo believes that Mr. Ambrose would have changed the scores based on input from Mr. Caputo, although he does not remember "the conversations for the exact number and there results."  [Dkt. 79-2 at 194:8-15].  Mr. Ameti ultimately received a total credit of 19 points: 6 for Achieve Results, 4 for Criticality of Skills, 3 for Qualifications, 3 for Business Orientation, and 3 for Interpersonal Skills.  [Dkt. 66-24 ¶ 83; Dkt. 79-1 ¶ 83].[3]  Mr. Ambrose scheduled a telecom for February 7, 2014 to review the "EAP rankings."[4]  *See* [Dkt. 89 (Opp'n Sealed Exhibits) at 38].  Mr. Ambrose elected to lay off Mr. Ameti and emailed human resources about his decision on February 11, 2014.[5]  [Dkt. 66-24 ¶ 92; Dkt. 79-1 ¶ 92; Dkt. 89 at 36].  Mr. Ambrose did not know Mr. Ameti's religion, color, or national origin while Mr. Ameti worked for Sikorsky.  [Dkt. 66-24 ¶ 93; Dkt. 79-1 ¶ 93].

Ultimately, Mr. Ameti and 17 other engineers from the Blades Product Centers were laid off. [Dkt. 66-24 ¶ 89; Dkt. 79-1 ¶ 89].  Mr. Ambrose submitted a declaration indicating Sikorsky eliminated a total of 250 positions.  [Dkt. 66-24 ¶ 90; Dkt. 79-1 ¶ 90; Dkt. 66-18 (Mot. Summ. J. Ex. 16, Ambrose Decl.) ¶ 7].  He also averred that Sikorsky did not hire a replacement for Mr. Ameti and his remaining

---

[3] The parties do not dispute that Mr. Ambrose changed the results initially entered by Mr. Caputo.  The Court will not rely on the details of the sealed content on page 34 of Dkt. 89 as the unlabeled information requires the Court to make assumptions which are not supported by admissible evidence.  Plaintiff's speculation about what the content means is not admissible under Fed. R. Evid. 602.

[4] It is unclear whether Mr. Ambrose altered Mr. Ameti's assessment before or after this meeting.

[5] Plaintiff argues Mr. Ambrose changed the scores at 12:43 PM and relies on a document submitted under seal.  *See* [Dkt. 79-1 ¶ 123; Dkt. 89 at 34].  The Court has reviewed the document and determines the date reflects an automated update rather than a change specific to Mr. Ameti.

colleagues assumed his responsibilities.  [Dkt. 66-24 ¶¶ 95-96; Dkt. 79-1 ¶¶ 95-96; Dkt. 66-3 ¶ 9].

Mr. Ameti filed a charge of discrimination with the CHRO on May 27, 2014. [Dkt. 66-24 ¶ 98; Dkt. 79-1 ¶ 98].  Mr. Ameti testified that "the only difference" between the other engineers and him was his skin color.  *See* [Dkt. 80 at 70:18-20].  Prior to this, he did not file a complaint while he was at Sikorsky.  [Dkt. 66-24 ¶ 102; Dkt. 79-1 ¶ 102].  His reasoning is that he previously filed a complaint with human resources in 2002 or 2003 regarding his boss's treatment, and he was subsequently laid off.  *See* [Dkt. 80 at 80:1-82:12].

## II.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D.

Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb*, 84 F.3d at 518); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

III. <u>Analysis</u>

A. <u>*Counts I and III: Employment Discrimination*</u>

Title VII prohibits employment discrimination on the basis of race, color, religion, and national origin. 42 U.S.C. § 2000e-2(a)(1). CFEPA similarly proscribes employment discrimination based on race, national origin, and

religious creed. Conn. Gen. Stat. § 46a-60(b)(1). The statutes employ slightly different language but are read coextensively. *State v. Comm'n on Human Rights and Opportunities,* 211 Conn. 464, 470 (1989); *see Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) ("The analysis of discrimination and retaliation claims under CFEPA is the same as under Title VII"). The claims are evaluated under the three-part, burden-shifting standard set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Preston v. Bristol Hosp.*, 645 F. App'x 17, 19 (2d Cir. 2016).

A plaintiff must first show: "(1) that he belonged to a protected class; (2) that he was qualified for the position he sought; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251–52 (2d Cir. 2014). Once a plaintiff makes such a showing, "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the adverse employment action." *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012). If the employer cites a proper explanation, the plaintiff must present evidence tending to show that the proffered reason is not the true reason but rather pretext for an impermissible reason. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010).

### 1. Prima Facie *Case*

To establish a prima facie case of disparate treatment for employment termination, "a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse

employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Id.* at 491-92 (citation omitted). Defendant does not challenge that Plaintiff is Muslim, was born in Macedonia, is Albanian, and has darker skin. Nor does Defendant challenge Plaintiff was qualified for his job. Defendant's challenges are centered on whether Plaintiff may recover for all the allegedly adverse actions and whether there exists an inference of discrimination based on race, religion, and national origin.

### i. Adverse Employment Actions

The parties do not dispute that Plaintiff's layoff is an adverse employment action. However, they do dispute whether Defendant's failure to give adequate raises in January 2010 and March 2011 and failure to give any raise at all in March 2012 constitute actionable adverse employment actions. *See* [Case No. 15-cv-00235, Dkt. 11 (Am. Compl.) ¶ 112; Dkt. 66-1 at 22-26; Dkt. 79 (Pl.'s Opp'n) at 38-39].[6]

Defendant argues these instances are barred by the statute of limitations because Mr. Ameti did not file a discrimination charge with the CHRO until May

---

[6] The Amended Complaint includes various allegations of adverse actions related to comments made by colleagues and supervisors. Defendant argued these comments are not actionable adverse actions, and Plaintiff did not oppose this contention. However, Plaintiff now alleges a new adverse action: that Mr. Caputo gave him a negative PFT score of "2" in 2014. [Dkt. 79 at 39]. This allegation does not appear in the Amended Complaint and the Court will not consider matters raised for the first time in the opposition to summary judgment. *See Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010). Regardless, Plaintiff has not demonstrated how one low score in a particular category of the evaluation rises to the level of an adverse action given that the overall evaluation is positive by his own admission. *See* [Dkt. 79 at 6 ("Beginning in 2008 and throughout his employment at Sikorsky, Ameti achieved excellent performance evaluations.").

27, 2014. *See* [Dkt. 66-1 at 23].[7] Plaintiff disagrees and contends his failure to file these claims with the EEOC are timely because they are continuing violations connected to his ultimate layoff.

Under the continuing violation doctrine, a plaintiff's timely EEOC claim will extend the statute of limitations period for any other claims of discrimination committed in furtherance of a discriminatory policy even if the prior claims otherwise would be barred if standing alone. *Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 155 (2d Cir. 2012); *see Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (stating that "if a plaintiff has experienced a continuous practice and policy of discrimination, . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it") (internal quotation marks omitted).

Typically discrete incidents "unrelated to an identifiable policy or practice" will not suffice as a continuing violation unless they are "*specifically* related and are allowed to continue unremedied for 'so long as to amount to a discriminatory policy or practice.'" *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996)) (emphasis added); *Fitzgerald*, 251 F.3d at 359 (acknowledging "acts so isolated in time . . . from each other . . . [or] from the timely allegations[ ] as to

---

[7] Because Defendant does not challenge whether the decisions (a) to give a below-average raise and (b) not to give a raise qualify as an adverse action, the Court will assume without deciding that they are adverse actions. *See Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 236 (2d Cir. 2015) (in a discrimination case involving the Americans with Disabilities Act, finding that the withholding of a discretionary bonus could qualify as an adverse employment action).

break the asserted continuum of discrimination will not suffice" but recognizing a continuing violation is viable where it relates to "specific and related instances of discrimination" unremedied long enough to constitute a discriminatory policy or practice) (internal quotation marks and citations omitted). Conduct that is "reasonably related," or within the scope of the EEOC investigation, may be considered a continuing violation. *Fitzgerald*, 251 F.3d at 359-60. Put another way, "[s]uccessive conduct that is part of a continuing wrong is by its very nature 'reasonably related' to the earlier conduct." *Id.* at 360.

It is well established that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)) (noting that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify."). Conversely, an individual is not barred from bringing *timely* discrete acts before the EEOC that are related to past, untimely acts. *Id.* The underlying principle therefore is: each *discrete act* starts a new clock and must be filed within the proper limitations period. *Id.*

For the purposes of filing an EEOC charge, a discrete, discriminatory act "occurs" on the day that the event happens. *Id.* at 110. Easily identifiable examples of discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire. . . ." *Id.* at 114; *Lightfoot*, 110 F.3d at 907 (acknowledging in an Age Discrimination in Employment Act of 1967 case that "termination through discharge or resignation" are completed acts that cannot be characterized as continuous). Other examples of discrete acts include "non

promotions and failure to compensate adequately." *Delrio v. Univ. of Connecticut Health Care*, 292 F. Supp. 2d 412, 420 (D. Conn. 2003); *see Lightfoot*, 110 F.3d at 907 (finding that plaintiff's attempt to characterize the defendant's failure to compensate him adequately by not giving him a pay raise is unavailing because his entitlement arose at the time of his promotion).

Even if Mr. Ameti was given a "below-average" raise or denied a raise he was entitled to receive, the Court concludes Defendant's failures to pay Mr. Ameti were discrete acts and are wholly unrelated to the subject matter of the timely EEOC claim: his layoff. *See Lightfoot*, 110 F.3d at 907; *Delrio*, 292 F. Supp. 2d at 420. They therefore are not "reasonably related" and cannot be considered part of an "ongoing policy." *Fitzgerald*, 251 F.3d at 359-60.

Although untimely prior discrete acts cannot be factored into recovery, the Court notes that in general they can be considered as evidence going to the merits, because an employee can still use "the prior acts as background evidence in support of a timely claim" even where certain discriminatory acts are time-barred. *Morgan*, 536 U.S. at 113. Such a use will have limited value in this case because Mr. Ameti fails to demonstrate he has personal knowledge his raises were "below-average" or that he was denied a raise when other similarly situated individuals received a raise. *See* [Dkt. 79-3 ¶ 12].

ii.   Discriminatory Intent

Mr. Ambrose, the decision-maker for the layoff, did not work with Mr. Ameti. *See* [Dkt. 79 at 30 (citing Dkt. 79-3 (Ex. F) ¶ 3)]. Mr. Ameti contends that Mr. Ambrose changed his RFT score after speaking with Mr. Caputo and that Mr.

Caputo's perception of him "has been poisoned by Tabone," who knew he was Muslim. *See id.* at 30-31. Plaintiff offers no evidence to support the supposition that Mr. Ambrose opinion of him was poisoned by Mr. Caputo.

"Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence." *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). Circumstantial evidence giving rise to an inference of discrimination includes (1) the employer's criticism of the plaintiff's performance in ethnically degrading terms; (2) invidious comments about others in the employee's protected group; or (3) the more favorable treatment of similarly situated employees not in the protected group. *See id.* The plaintiff's burden of proof is *de minimis* and need only "proffer[ ] admissible evidence show[ing] circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Id.* at 38. Because Plaintiff does not allege his performance was ever critiqued in ethnically degrading terms, the Court will focus on alleged invidious comments and favorable treatment of similarly situated employees. The Court finds that Mr. Ameti fails to establish discriminatory intent for the reasons stated below.

### a. Invidious Comments

The Court first addresses Plaintiff's examples of comments made by Defendant's employees that are alleged to demonstrate discriminatory intent. The central question in evaluating remarks is whether they have a "tendency to

show that the *decision-maker* was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007), *abrogated on other grounds by Vogel v. CA, Inc.*, 662 F. App'x 72, 75 (2d Cir. 2016) (emphasis added). In other words, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Id.* at 115. A helpful framework to consider is "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (establishing these factors in the context of determining the probative value under Fed. R. Evid. 403).

It is worth noting at the outset that Mr. Ambrose, who made the decision to lay off Mr. Ameti, is not alleged to have made *any* comments about Mr. Ameti's race, religion, or national origin. In fact, Mr. Ambrose stated in his declaration that he was not aware of Mr. Ameti's "color, national origin, or religion" during the time Mr. Ameti worked for Sikorsky. [Dkt. 66-18 ¶ 8]. Mr. Ameti has not provided any admissible evidence refuting this position.

Ameti argues Mr. Ambrose must have known Mr. Ameti was Muslim "because Tabone spoke directly to Caputo about Ameti's Muslim religion and his background" and the harassment policy required an employee to notify a supervisor or human resources about such harassment. *See* [Dkt. 79 at 31]. Mr.

Ameti reasons that Sikorsky and Mr. Ambrose must have known he was Muslim, "assuming it followed its own internal policy." *Id.* This argument is unpersuasive for two reasons. First, the statement about Mr. Ameti's ethnicity was made by Mr. Tabone to Mr. Caputo in Mr. Ameti's absence and therefore the statement would not constitute harassment requiring a report unless Mr. Caputo is also Muslim. Second, it is unpersuasive because it is speculative. Mr. Ameti was not present when the alleged conversation between Mr. Tabone and Mr. Caputo occurred. Therefore, the testimony is inadmissible because Mr. Ameti did not have personal knowledge about the conversation. *See* Fed. R. Evid. 602.

Aside from one stray remark, no comments made in either 2010 or 2011 are attributed to Mr. Caputo, who was Mr. Ameti's supervisor until the last two years prior to his termination and who advised Mr. Ambrose during the reduction in force process. *See* [Dkt. 80 at 37:9-11]. Mr. Ameti testified Mr. Caputo said:

> One time [Mr. Caputo] came to my desk and told me that he saw some kind of information somewhere about an Albanian tradition where some of the female members of the family where there was no male party in the family, they were allowed to live their life as a male so they can take care of the family, and that was a very strange and primitive thing for some nation to do that.

*Id.* at 35:15-24. The fact that this comment was made three or four years prior to Mr. Ameti's layoff indicates it had little or nothing to do with his discharge. *See Henry*, 616 F.3d at 149. While the content may reflect Mr. Caputo's disagreement with a single Albanian cultural norm, it is only a stray remark that does not reflect anti-Albanian bias any more than criticism of gender pay inequity in the United States reflects anti-American bias. *See Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 316–17 (E.D.N.Y. 2012) (declining to find discriminatory animus based on

national origin where the defendant had not "said anything about plaintiff's national origin," and where the allegedly discriminatory phrase lacked any obvious connection to the plaintiff's national origin); *see also Agrawal v. Monemagno*, 574 F. App'x 570, 576 (6th Cir. 2014) (affirming district court's conclusion that a "remark alluding to a 'cultural divide'" was insufficient to serve as evidence of national origin or race discrimination because "this statement could be interpreted several ways"); *Espinoza v. Dep't of Corr.*, 509 F. App'x 724, 734 (10th Cir. 2013) (finding defendant's "acknowledg[ment] that cultural differences existed" insufficient to establish discriminatory intent where the plaintiff "did not present evidence on what [the defendant] meant by this statement, develop a factual record to demonstrate what the differences were, or explain how this comment established a basis for his belief of discrimination in this instance"); *see generally White v. Andy Frain Servs., Inc.*, 629 F. App'x 131, 134 (2d Cir. 2015) (ruling "these off-color comments were no more than stray remarks" because plaintiff failed to establish the requisite causal connection in a retaliation claim).

For the same reasons, the Court finds comments made by Mr. Leahy and Mr. Conti to be isolated, stray remarks. Mr. Leahy's comment—"that you see how well we treat you, we give you job, we give you money, when some American can have this job, we give it to you"—is too remote from the decision-maker to mean anything other than an isolated, albeit off-color, comment. *See* [Dkt. 82-4 (Opp'n Ex. S, Ameti Dep.) at 435:1-5]. Because Mr. Ameti did not testify to the number of times and when Mr. Leahy allegedly made this comment, the Court cannot and

will not assume discriminatory motive.  The Court also finds Mr. Conti's comment that he wanted to file a turnback against Mr. Ameti, [Dkt. 80 at 101:6-13], to be facially unrelated to any protected class; Mr. Ameti's speculation that the comment must be based on his skin color because "[t]hat was the only difference than the rest of the engineers in that group" is unpersuasive.  *Id.* at 70:18-20.

The most serious comments are said to have been made at unspecified times over a period of years.  They are attributed to Mr. Tabone, an individual who held the same position as Mr. Ameti and who was also supervised by Mr. Caputo.  Mr. Ameti describes Mr. Caputo and Mr. Tabone as "very close friends."  [Dkt. 80 at 38:3-9].  Mr. Ameti testified that Mr. Tabone told others that Mr. Ameti was a Muslim, possibly a terrorist, and that he had multiple wives.  *See id.* at 71:8-24, 87:17-88:6; [Dkt. 82 at 271:17-24].  For example, Mr. Ameti testified that Mr. Tabone told Ms. Pavia that Mr. Ameti was Muslim and might be a terrorist; subsequently, Ms. Pavia asked him whether it was true that he owned a gun. [Dkt. 82 at 272:10-73:7].  Mr. Ameti estimated that Mr. Tabone (1) asked him how many wives he had approximately five times, *id.* 274:14-75:17; (2) referred to Muslims as terrorists between three to five times, *id.* at 276:21-279:7, and (3) told other colleagues Mr. Ameti was Muslim at least five times, [Dkt. 80 at 38:2-10; Dkt. 82 at 262:22-265:15].

The Court finds that these comments are nonetheless stray remarks because they were not made by a decision-maker and bear no connection to the layoff.  *See Henry*, 616 F.3d at 149.  Moreover, Mr. Ameti has not provided any concrete evidence that Mr. Tabone made these comments to Mr. Caputo at all, let

alone at a time close to the layoff. The best Mr. Ameti can do is speculate that Mr.

Tabone made these comments to Mr. Caputo simply because they were friends,

as he does not allege he personally heard an exchange between the two. *See*

[Dkt. 79 at 31; Dkt. 80 at 88:13-15 (indicating Mr. Tabone talked "to [his] boss

about [his] religion and where [he] c[a]me from"); Dkt. 79-3 (Ex. F) ¶ 10 ("Michael

Tabone, (Caucasian, United States Citizen) an engineer in my group, was an

extremely close friend of Caputo and spoke directly to Caputo about my Muslim

religion and background."). Because Mr. Ameti has no personal knowledge of

this alleged conversation, the Court will not consider his deposition testimony or

his affidavit as they are inadmissible. *See* Fed. R. Evid. 602 ("A witness may

testify to a matter only if evidence is introduced sufficient to support a finding

that the witness has personal knowledge of the matter."); *Whethers v. Nassau

Health Care Corp.*, 956 F. Supp. 2d 364, 379 (E.D.N.Y. 2013) ("A plaintiff's

speculations, generalities, and gut feelings, however, genuine, when they are not

supported by specific facts, do not allow for an inference of discrimination to be

drawn.").

### b. Similarly Situated Employees

"An employee is similarly situated to co-employees if they were (1) subject

to the same performance evaluation and discipline standards and (2) engaged in

comparable conduct." *Ruiz*, 609 F.3d at 493-94. The restructuring process led to

layoffs in February 2014, and Sikorsky implemented an assessment process in

order to make the correct determinations about who to lay off. *See* [Dkt. 66-24 ¶

67; Dkt. 79-1 ¶ 67]. The process required employees to be ranked relative to

similarly situated employees.  *See* [Dkt. 66-24 ¶ 65; Dkt. 79-1 ¶ 65].  Mr. Ameti was evaluated in comparison with the other General Engineering Staff Engineers and Managers and identified as similarly situated and ranked in the same category as him.  *See* [Dkt. 69 (Mot. Summ. J. Sealed Exs.) at 17 of PDF].

The documents filed by the parties related to the Assessment Matrix and the employees' resulting scores show that Mr. Ameti received a total credit grade of 19, which falls within the range of those who were selected for layoffs.  *See* [Dkt. 66-24 ¶ 83; Dkt. 79-1 ¶ 83; Dkt. 69 at 39-46].  Mr. Ameti has not provided the Court with statistics or other information about the race, national origin, and religion of other similarly situated engineers who were not laid off.  Mr. Ameti received the lowest score out of the engineers in his category rated by Mr. Caputo.  There are myriad reasons other than discrimination why Messrs. Ambrose and Walling selected Plaintiff to be laid off.  Engineers were assessed based on their results achieved, criticality of skills, qualifications, business orientation, and interpersonal skills in order to achieve the company's objectives, which included retaining the best talent and align with the current and projected business conditions.  *See* [Dkt. 66-24 ¶¶ 64-68, 70; Dkt. 79-1 ¶¶ 64-68, 70].  The assessment process included several tiers, with higher levels of management reviewing assessments by lower-level managers. [Dkt. 66-24 ¶ 69; Dkt. 79-1 ¶ 69].  They also would have received input from other managers in addition to Mr. Caputo, and it therefore cannot be said that Mr. Caputo's advice alone caused Mr. Ambrose to select Ms. Ameti for a layoff.  Plaintiff claims he was not assessed fairly. [Dkt. 79-1 ¶ 70].  It is not the Court's role to act as a "super personnel

department" and second guess the company's business judgments. *Estate of Hamilton v. City of New York,* 627 F.3d 50, 56 n.7 (2d Cir. 2010) (citing *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999), *abrogated on other grounds by Eisenhour v. Weber Cty.*, 744 F.3d 1220, 1227 (10th Cir. 2014)). Thus, the Court finds that Mr. Ameti has not established other similarly situated engineers were treated more favorably than him.

### 2.    *Legitimate, Non-Discriminatory Reason*

Assuming, *arguendo*, Mr. Ameti established a *prima facie* case, "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the adverse employment action." *Reynolds*, 685 F.3d at 202. Defendant contends that the business factors giving rise to a reduction in force constitute a legitimate, non-discriminatory reason for the adverse action. *See* [Dkt. 66-1 at 19]. Ample case law supports the position so long as the justifications are facially reasonable. *See Windham v. Time Warner, Inc.*, 275 F.3d 179, 188 (2d Cir 2001) (concluding a legitimate business reason for terminating employees was that the department had less work and recognizing "the company also met its burden of producing evidence of facially reasonable justifications for selecting each respective plaintiff for termination"); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 717 (2d Cir. 1994) (acknowledging that defendant's "business-justified, company-wide reduction in its work force in response to changes in business emphasis and economic necessities" and its reliance on "non-discriminatory guidelines in selecting employees to be fired" was sufficient

to rebut the *prima facie* showing); *Shan v. New York City Dep't of Health and Mental Hygiene*, 316 F. App'x 23, 2009 WL 707404, at *1 (2d Cir. 2009) (summary order) ("Shan was terminated as part of a nondiscriminatory reduction in force that was mandated by the mayor's direction to cut DOH's budget. . . ."); *Dixon v. Metropolitan Dist. Comm'n.*, 3:14-cv-01468 (VAB), 2017 WL 4247051, at *8 (D. Conn. Sept. 25, 2017) ("Courts have consistently found that a company-wide reduction in force is a legitimate, non-discriminatory reason for terminating someone's employment."); *Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 483 (S.D.N.Y. 2013 ("[T]he law is clear that courts should not second-guess an employer's reasonable business judgment regarding personnel matters.").

Defendant in this case was required to reduce its work force as a result of a decrease in customer demand. *See* [Dkt. 66-24 ¶ 63; Dkt. 79-1 ¶ 63]. The system used to select employees for layoff is based on five key criteria: (1) the employee's ability to achieve results; (2) the criticality of the employee's skills; (3) the employee's qualifications; (4) whether and how the employee is business-oriented; and (5) the employee's interpersonal skills. *See* [Dkt. 66-24 ¶ 70; Dkt. 79-1 ¶ 70]. Mr. Ameti was evaluated on this standard and obtained a score that put him within the range of discharge. *See* [Dkt. 69 at 39-46 of PDF]. Because these factors are facially reasonable, the Court finds Defendant has sufficiently established a legitimate, non-discriminatory basis for the layoff.

### 3. *Pretext*

If the employer cites a proper explanation for the adverse employment action, the plaintiff must show pretext. *Ruiz*, 609 F.3d at 492. To establish

pretext, a plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). "Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Chambers*, 43 F.3d at 38 (internal quotation marks and citations omitted); *Lifranc v. New York City Dep't of Educ.*, No. 07-CV-1109 (KAM) (LB), 2010 WL 1330136, at *10 (E.D.N.Y. Apr. 6, 2010) (stating a plaintiff may survive summary judgment "through direct, statistical, or circumstantial evidence as to whether the employer's reason for its decision to discharge is false and as to whether it is more likely that a discriminatory reason motivated the employer to make an adverse employment decision") (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994)).

Mr. Ameti argues that Defendant's non-discriminatory reason is pretextual because he received a "Fully Competent" summary review for 2013. *See* [Dkt. 79 at 36]. He claims that Mr. Caputo gave him a score high enough to survive the reduction in force, but Mr. Ambrose reduced the score after speaking to Mr. Caputo. *Id.* In arguing Mr. Caputo advised Mr. Ambrose to lay off Mr. Ameti, Mr. Ameti relies on the fact that he was told Mr. Caputo did not like him, he received a "2" on his 2011 PFT, he did not get the "pay increase that was actually

warranted," and Mr. Caputo called his culture "strange" and "primitive" in 2010 or 2011. *Id.* at 36-37.

Here, Mr. Ameti fails to demonstrate that Defendant's legitimate, non-discriminatory reason for discharging him is merely pretext. There is no evidence elucidating the conversation between Mr. Ambrose and Mr. Caputo. A plaintiff may not establish pretext through mere speculation, and nothing suggests Mr. Ambrose decided to terminate his employment on the basis of his race, religion, or national origin. *See Crawford-Mulley v. Corning Inc.*, 194 F. Supp. 2d 212, 220 (W.D.N.Y. 2002) ("This is simply a case of a person who disagrees with the reasons articulated for her failure to obtain a certain position, one for which she failed to submit any formal application. Having thoroughly reviewed the record before me in a light most favorable to the plaintiff, I find no evidence to suggest that Corning's stated non-discriminatory reasons for its decision not to offer the position in question to Crawford–Mulley were false, and plaintiff's speculation concerning the employer's motivation is insufficient to establish pretext."). Contrary to Plaintiff's contentions, the admissible evidence demonstrates there existed legitimate reasons for selecting Mr. Ameti for layoff. Mr. Caputo testified that he believed Mr. Ameti's design engineer skills were "lacking," [Dkt. 66-5 at 93:8-23], that Mr. Ameti made mistakes and relied on coworkers to correct them, *id.* at 136:16-23, and he was more inclined to sit at his desk rather than be on the shop floor [Dkt. 66-6 at 90:3-11]. Mr. Ameti therefore fails to meet his burden to show the proffered reason is pretextual.

**B.** *Counts II and IV: Hostile Work Environment*

Plaintiff alleges he was subject to a hostile work environment "based upon his darker skin, Middle Eastern appearance, and Muslim Faith" in violation of Title VII and CFEPA. [Case No. 15-cv-00235, Dkt. 11 ¶ 128, 146]. Title VII makes it unlawful for an employer to subject individuals to a discriminatorily hostile or abusive work environment. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993); 42 U.S.C. § 2000e–2(a)(1). The parties address the CFEPA claim under the same standard, which is in keeping with federal and state courts and will be the standard used by this Court. *See Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 50-51 (2d Cir. 2014) (addressing Title VII and CFEPA hostile work environment claims under the same standard); *Flowers v. N. Middlesex YMCA*, No. 3:15-cv-705 (MPS), 2016 WL 1048751, at *2 (D. Conn. Mar. 11, 2016) ("The parties do not dispute that a hostile work environment claim under CFEPA is analyzed in the same manner as one brought under Title VII. I therefore use the same legal framework in addressing the YMCA's argument that Flowers fails to state federal and Connecticut law hostile environment claims."); *Brittell v. Dep't of Correction*, 247 Conn. 148, 165–168 (1998) (using the Title VII standard governing a hostile work environment claim for the CFEPA claim).

To prove that a workplace is actionably "hostile" under Title VII, a plaintiff must demonstrate that: "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373

(2d Cir.2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997)); *see also Harris*, 510 U.S. at 21–22 (establishing similar standard). There are both objective and subjective components to this standard: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).

### 1.     *Severe and Pervasive*

Plaintiff claims that Messrs. Caputo, Tabone, Jones, Leahy, and Conti created an environment was "sufficiently severe or pervasive" to alter the conditions of his employment. [Dkt. 79 at 41-42]. The Supreme Court has established a non-exhaustive list of factors relevant to determining whether a workplace is so severely or pervasively hostile as to support a Title VII claim. These include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether the conduct unreasonably interfered with [plaintiff's] work; . . . whether it unreasonably interferes with the employee's work performance[;]" and "[t]he effect on the employee's psychological well-being[.]" *Harris*, 510 U.S. at 23. These factors must be considered under "the totality of the circumstances," *Williams v. Westchester*, 171 F.3d 98, 100 (2d Cir.1999) (citing *Harris*, 510 U.S. at 23), and evaluated "cumulatively" so that the court can "obtain a realistic view of the work environment," *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.1997) (citations omitted).

When a plaintiff alleges the hostile environment is created by a series of incidents, he must show they were "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano*, 294 F.3d at 374. Ultimately, it must be shown that the "workplace was so severely permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of his employment." *Id.* at 373; *see Perry*, 115 F.3d at ("Evidence of a general work atmosphere . . .—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim.") (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987)).

Plaintiff classifies certain facially neutral acts as "severe or pervasive" harassment. These acts include Mr. Conti's threats that filing turn-backs would jeopardize his job[8] and Mr. Caputo's (a) failure to give him a desired raise on several occasions, (b) omission of Mr. Ameti's name from a patent, (c) rating of "2" on a PFT, and (d) failure to give him a position for which he was allegedly promised. [Dkt. 79 at 41-42]. Although "facially neutral incidents" can be considered in the totality of circumstances, there must be circumstantial evidence or another basis that demonstrates these acts are discriminatory. *See Alfano*, 294 F.3d at 378 (Title VII sex case); *Sanchez-Vazquez v. Rochester City Sch. Dist.*, 519 F. App'x 63, 64 (2d Cir. 2013) (applying the rule to a § 1981 hostile

---

[8] The Court will not consider Mr. Conti's email wherein he stated, "I should put in a turnback against him," as it was not circulated to Mr. Ameti. [Dkt. 89 at 40 of PDF]. Even if this comment could be attributed to a discriminatory motive, Mr. Ameti does not allege he received the email at any time he was employed and therefore could not have "subjectively perceive[d]" the comment to create a hostile work environment. *See Raspardo*, 770 F.3d at 114.

work environment claim based on race). For the same reasons as above, Plaintiff has failed to establish circumstantial evidence giving rise to a discriminatory motive. Therefore, these facially neutral acts do not satisfy the "severe and pervasive" requirement.

The Court also finds that Mr. Caputo's and Mr. Leahy's one-off comments are not severe enough to be actionable alone. In either 2010 or 2011, Mr. Caputo said on one occasion that a certain Albanian custom was "primitive" and "very strange." [Dkt. 80 at 35:15-22]. Mr. Leahy commented that Mr. Ameti was taking American jobs, although the record is unclear whether Mr. Leahy said this comment once or a few times. [Dkt. 80 at 89:2-11; Dkt. 82-4 at 435:1-14]. Neither of these comments are offensive enough to alter the conditions of Mr. Ameti's employment as they are at best off-color and are certainly isolated. *Compare Alfano*, 294 F.3d at 374 ("But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace."); *with Martinez v. Connecticut, State Library*, 817 F. Supp. 2d 28, 52 (D. Conn. 2011) ("Courts in the Second Circuit have found that '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'") (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 76 (2d Cir. 2001)).

The main question now is whether Mr. Tabone's comments that Mr. Ameti was Muslim, a terrorist, and had multiple wives, is sufficiently severe and pervasive to alter the work environment when considered under the totality of the circumstances. Mr. Ameti testified that Mr. Tabone told other colleagues Mr.

Ameti was Muslim at least five times. *See* [Dkt. 80 at 38:2-10; Dkt. 82 at 262:22-265:15]. He also estimated that Mr. Tabone asked him how many wives he had five times, [Dkt. 82 at 275:14-17], and he made comments like this to Ms. Pavia two to five times, *id.* at 275:24-76:4. Mr. Tabone referred to Muslims as "terrorists" between three to five times. *Id.* at 276:21-279:7. The Court finds Mr. Ameti's vague references to the number of times these incidents occurred without providing approximate dates makes it very difficult to determine whether the comments were coupled together on a limited number of occasions or happened separately, and whether the comments were made in a consistent manner. In addition, Plaintiff's inability to recall when and how often these comments were made undermines his claim that they were sufficiently severe and pervasive to alter his work environment. The Court need not decide whether Mr. Tabone's comments are "severe and pervasive," however, because Mr. Ameti fails to show that his coworker's comments can be imputed to the employer. The Court will now turn to this reasoning.

### 2. *Imputing Objectionable Conduct*

Mr. Tabone's comments cannot be imputed to Sikorsky. Where a hostile work environment is created by a coworker, rather than a supervisor, "'the employer will be held liable only for its own negligence,' and the plaintiff must demonstrate that the employer 'failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (quoting *Duch v.*

*Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)). "In determining the appropriateness of an employer's response, we look to whether the response was 'immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility [the employer] has with respect to [the employee's] behavior.'" *Id.* (quoting *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997)).

Sikorsky provided Mr. Ameti with a reasonable avenue to complain about the hostile work environment created by Mr. Tabone and other coworkers. It had a harassment policy, which states, "If you have witnessed or been the victim of harassment, you should immediately notify the Company through one or more of the following: (1) your supervisor (unless he/she is the alleged harasser) or (2) your EEO representative, Diversity manager or Human Resources representative." [Dkt. 66-24 ¶ 3; Dkt. 79-1 ¶ 3]. The fact that the policy provides multiple methods for raising a complaint supports a finding that it has reasonable avenues through which to navigate. *See Duch*, 588 F.3d at 763. Mr. Ameti does not dispute the existence of the policy or challenge the reasonableness of the avenues to complain.

Alternatively, Defendant can be liable if it "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch*, 588 F.3d at 763. "This standard requires a plaintiff to show that (1) *someone* had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable."

*Id.* An employee's knowledge may be imputed to an employer when agency principles so apply. *Id.* (citing *Torres v. Pisano*, 116 F.3d 625, 636-37 (2d Cir. 1997)). Agency principles require the employee to be at (a) a high enough level to be a proxy for the company, or (b) "charged with a duty to act on the knowledge and stop the harassment," or (c) "charged with a duty to inform the company of the harassment." *Id.* (quoting *Torres*, 116 F.3d at 636-37). A non-supervisory coworker's actions can be imputed when the individual "has an official or strong de facto duty to act as a conduit to management for complaints about work conditions." *Id.* (internal quotations marks omitted). Mr. Ameti claims that Mr. Caputo and Mr. Jones had a duty to report Mr. Tabone's comments under the policy yet failed to do so.[9]

With respect to Mr. Caputo, Mr. Ameti has provided no admissible evidence indicating Mr. Caputo was actually or constructively aware of Mr. Tabone's harassment. As aforementioned, Mr. Ameti cannot rely on mere speculation that Mr. Tabone told Mr. Caputo inappropriate comments simply because they were close friends. *See* Fed. R. Evid. 602. Mr. Caputo himself avers he was not aware of Mr. Tabone's comments about Mr. Ameti's religion while Mr. Ameti worked for Sikorsky. [Dkt. 66-3 ¶ 7]. Therefore, Defendant's knowledge of the harassment cannot be imputed through Mr. Caputo.

Mr. Jones is alleged to have heard Mr. Tabone say, "Do you know that Pellumb is Muslim?" on one occasion. *See* [Dkt. 80 at 38:11-15]. Assuming that

---

[9] To the extent non-supervisory employees heard Mr. Tabone's comments, Mr. Ameti has not provided any evidence they had "an official or strong de facto duty to act as a conduit to management for complaints about work conditions." *Id.* Therefore, liability cannot be imputed through these non-supervisory coworkers.

Mr. Jones did not take any action, the Court finds his response to be reasonable in light of this single, isolated question, which is not on its face discriminatory or harassing.

To the extent that Mr. Ameti did not report the harassment because of his past experience being laid off at UTC after he complained about his supervisor in 2002 or 2003, the Court finds this unpersuasive to impute objectionable conduct. First, Mr. Ameti does not explain in what capacity he worked for UTC and how his position was related at all to his position at Sikorsky. Second, he does not indicate whether there existed any applicable UTC policies comparable to the one issued by Sikorsky. Third, he does not suggest that any of the individuals with and for whom he worked were the same. Fourth, there is more than a decade in between the alleged incidents and Mr. Ameti has not provided any legal basis for the Court to conclude this argument overcomes his failure to establish the imputation of objectionable conduct.

The Court surmises that Mr. Ameti's failure to report the alleged harassment is more likely attributable to the fact that he did not find the conduct harassing. Indeed, with respect to Mr. Tabone's comments about Mr. Ameti having multiple wives, Mr. Ameti appears able to make light of the remarks. When describing the context in which Mr. Tabone made these comments, Mr. Ameti testified, "And he will yell from the other side [of the engineer work area], 'Hey, Pellumb, can you tell us how many wives you have? Just to let you know, guys, Pellumb has three wives[,]' [to which Plaintiff quipped,] 'I wish that were true, but it wasn't." [Dkt. 82 at 266:13-267:9]. After making this remark, Mr.

Ameti's counsel admonished him cautioning, "Now, now, this is on the record," to which Mr. Ameti replied, "Okay." *Id.* at 267:7-10. Although the Court did not consider this comment in arriving at its conclusion, it nonetheless suggests the Court's conclusion is apt.

### C. *Count V Through VII: State Claims*

In granting summary judgment on all the federal claims and the associated state claims falling under the same analysis, the Court will not exercise supplemental jurisdiction over the remaining state claims. 28 U.S.C. § 1367(c)(3); *see* [Dkt. 62].

## IV. Conclusion

For the above reasons, the Court GRANTS summary judgment as to Counts I through IV. The Court declines to exercise jurisdiction over Counts V through VII. The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: February 6, 2018